72 F.3d 740
 64 USLW 2397, 105 Ed. Law Rep. 885,
11 IER Cases 352,
95 Cal. Daily Op. Serv. 9438,
95 Daily Journal D.A.R. 16,440
 UNITED STATES of America ex rel., Plaintiff,
Harold R. FINE, Plaintiff-Appellant,
v.
CHEVRON, U.S.A., INC.; Bechtel Petroleum Operations, Inc.;
and Williams Brothers Engineering Company,
Defendants-Appellees.
UNITED STATES of America ex rel., Plaintiff,
Harold R. FINE, Plaintiff-Appellant,
v.
The UNIVERSITY OF CALIFORNIA, and The Board of Regents of
the University of California, Defendants-Appellees.
 Nos. 93-15012, 93-15728.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 31, 1995.
Decided Dec. 12, 1995.
 
 Stuart M. Nelkin, Nelkin & Nelkin, Houston, Texas, for the plaintiff-appellant.
 Walter R. Allan, Alson Kemp, Jr., and Michael F. LaBianca, Pillsbury, Madison & Sutro, San Francisco, California, for defendant-appellee Chevron; Philip R. Placier and Scott L. Gardner, Thelen, Marrin, Johnson & Bridges, San Francisco, California, for defendant-appellee Bechtel Petroleum; Weyman I. Lundquist and Stephanie M. Hinds, Heller, Ehrman, White & McAuliffe, San Francisco, California, for defendant-appellee Williams Brothers Engineering.
 William D. Hunter, Collette & Erickson, San Francisco, California, for defendants-appellees The University of California and The Board of Regents.
 Michael F. Hertz and Joan E. Hartman, United States Department of Justice, Washington, DC, for amicus curiae United States.
 J. Stephen Lawrence, Jr., Arnold & Porter, Washington, DC, for amicus curiae Stanford University.
 Appeals from the United States District Court for the Northern District of California.
 Before: WALLACE, Chief Judge, REINHARDT, BEEZER, HALL, KOZINSKI, LEAVY, TROTT, FERNANDEZ, T.G. NELSON, KLEINFELD, and HAWKINS, Circuit Judges.
 Separate concurrence by Judge KOZINSKI in which Judge T.G. NELSON joins; separate concurrence by Judge TROTT in which Judge KOZINSKI joins; separate concurrence by Judge HAWKINS in which Judge KOZINSKI joins; dissent by Judge LEAVY in which Judge REINHARDT joins.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 This is a consolidated appeal from the dismissal of two qui tam actions under the False Claims Act. The relator, Harold Fine, is a former employee of the Office of the Inspector General at the U.S. Department of Energy. He left his job and filed these, and several other, qui tam actions. Fine concedes that his actions are based upon publicly disclosed allegations and that he therefore cannot maintain the actions unless he qualifies as an "original source."
 
 
 2
 The district court, in separate orders, dismissed both actions for lack of subject matter jurisdiction. This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1291. On appeal by Fine, a panel of this Court reversed and remanded.[1] A majority of the nonrecused active judges then voted to rehear the case en banc.
 
 
 3
 We now affirm both dismissals because we conclude that Fine cannot be an "original source." To qualify as an original source, one must voluntarily provide the information forming the basis of the claim to the government prior to filing suit. Fine did provide the information underlying his claims to the government prior to filing suit. He did so, however, as a part of his job responsibilities. We hold that his provision of this information to his employer--the government--was not voluntary within the meaning of the False Claims Act; he therefore is not an original source.
 
 I.
 
 4
 Harold Fine worked for almost ten years as the Assistant Manager of the Western Region Audit Office for the Office of Audits of the Office of the Inspector General at the U.S. Department of Energy. His job required him to supervise audits that other employees had conducted, and edit audit reports that others had written. During his last four years on the job, between eightyfour and ninety-seven percent of the audit reports from the Western Region Audit Office came from employees under his supervision.
 
 
 5
 He left the job in 1992, apparently disgruntled because his supervisors either could not or would not take action against every perceived violation he brought to their attention. During the year following his retirement, Fine filed a total of seven qui tam actions under the False Claims Act, two of which are at issue here.[2] Two months after his retirement, he brought one action "on behalf of the United States" against Chevron, U.S.A., et al. One month later, he filed suit against the University of California and its Board of Regents.
 
 
 6
 After the government declined to intervene, the complaints were unsealed and served on the defendants. Discovery progressed apace until the defendants in both cases moved to dismiss. The district court granted both motions, concluding orally in the case against Chevron that "it makes no sense" to permit Fine to bring a qui tam action. In the case against the University of California, the court issued a published opinion, United States ex rel. Fine v. University of California, 821 F.Supp. 1356 (N.D.Cal.1993). This ruling dismissed the case against the University of California because "Mr. Fine was not an 'original source' and [Inspector General] auditors should be barred from bringing qui tam actions arising from [Inspector General] audits." Id. at 1357. We review these dismissals for lack of subject matter jurisdiction de novo. United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1516-17 (9th Cir.1995).
 
 II.
 
 7
 Numerous of this and other courts' opinions have rehearsed the history and purposes of the False Claims Act and its qui tam provisions. See, e.g., United States ex rel. Anderson v. Northern Telecom, Inc., 52 F.3d 810, 812-13 (9th Cir.1995); Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1418-20 (9th Cir.1992); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir.1991). These cases support our observation that the paradigm qui tam case is one in which an insider at a private company brings an action against his own employer. In Wang, for instance, we noted that "[t]he paradigm qui tam plaintiff is the 'whistleblowing insider.' Qui tam suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime." Wang, 975 F.2d at 1419 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1161 (3d Cir.1991)); see, e.g., Schumer, 63 F.3d at 1515 (9th Cir.1995) (qui tam action brought by former manager at Hughes Aircraft Company); United States ex rel. Green v. Northrop Corp., 59 F.3d 953 (9th Cir.1995) (qui tam action brought by former employee of Northrop Corporation).
 
 
 8
 Legislative history also suggests that Congress envisioned only this paradigm suit when enacting the current version of the qui tam provisions. The Senate Report to the 1986 Amendments to the False Claims Act, for instance, states that "[t]he Committee's overall intent in amending the qui tam section of the False Claims Act is to encourage more private enforcement suits." S.Rep. No. 345, 99th Cong., 2d Sess. 23-24 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5266, 5288-5289 (emphasis added). Similarly, the House Report emphasizes that "[t]he purpose of the qui tam provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." H.R.Rep. 660, 99th Cong., 2d Sess. 23 (1986) (emphasis added).
 
 
 9
 This case, in which a government employee, who bore as the "paramount responsibility of his position" the duty to disclose fraud to his supervisors, Fine, 821 F.Supp. at 1360, defies the paradigm. That this case involves application of a statute to a factual scenario Congress may never have envisioned should not give us too much pause, however. The terms of the jurisdictional provisions governing this case are, after all, "unusually precise." Hagood, 929 F.2d at 1419. Our analysis of whether the district court had jurisdiction to hear Fine's claims therefore begins with the "precise" language of the statute.
 
 III.
 The False Claims Act provides:
 
 10
 (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
 
 
 11
 (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.
 
 
 12
 31 U.S.C. Sec. 3730(e)(4)(A)-(B).
 
 
 13
 The parties in this case agree that Fine's actions are based upon publicly disclosed allegations. Section 5 of the Inspector General Act of 1978 requires Inspectors General to prepare semiannual reports summarizing the activities of their offices and to furnish those reports to agency heads, Congress, and the public. See 5 U.S.C. app. 3, Sec. 5. Fine concedes that he based his claims on reports he furnished to his superiors, the contents of which were properly disclosed to the public under the terms of the Inspector General Act. Thus, Fine can maintain this action only if he qualifies as an original source of the information, and we limit our discussion and holding to this question.
 
 
 14
 The statute provides that a relator seeking to avoid the bar against suits based on public disclosures must show both that he has "direct and independent knowledge of the information on which the allegations are based," and that he "has voluntarily provided the information to the Government before filing an action." 31 U.S.C. Sec. 3730(e)(4)(B). At least two courts have addressed whether an auditor for the Office of the Inspector General can have "direct and independent knowledge." See United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 20 (1st Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991) (reasoning that the "fruits of [the auditor's] effort belong to his employer," so he could not have "independent knowledge" of the information); United States ex rel. Fine v. MK-Ferguson Co., 861 F.Supp. 1544, 1554 (D.N.M.1994) (holding that Harold Fine did not have direct and independent knowledge because he did not personally conduct the audits that led to the public disclosures).
 
 
 15
 Only the district court in this case, however, has addressed whether an employee of the Office of the Inspector General can meet the other part of the original source test, i.e., whether he can be deemed to have provided information to the government "voluntarily." It concluded that Fine's actions "cannot be construed as 'voluntary' [because they] were compelled by the nature of his employment." Fine, 821 F.Supp. at 1360. The court's holding rested on its finding that disclosing fraud was "the paramount responsibility of [Fine's] position." Id. Because we agree with the district court regarding the second part of the original source requirement, we need not discuss whether Fine's knowledge was direct and independent.
 
 
 16
 The district court is surely correct in its conclusion that Fine was no volunteer. He was a salaried government employee, compelled to disclose fraud by the very terms of his employment.[3] He no more voluntarily provided information to the government than we, as federal judges, voluntarily hear arguments and draft dispositions. Cf. LeBlanc, 913 F.2d at 20 (noting that a relator employed as a Quality Assurance Specialist for the United States Government Defenses Contract Administrative Service had the duty to uncover fraud as a condition of his employment).
 
 
 17
 Dictionary definitions of "voluntary" support this common-sense reading.[4] Webster's Third, for example, provides the following definition:
 
 
 18
 Acting, or done, of one's own free will without valuable consideration; acting or done without any present legal obligation to do the thing done or any such obligation that can accrue from the existing state of affairs.
 
 
 19
 Webster's Third New International Dictionary 2564 (1981) (definition 1(g)). Fine, by contrast, acted in exchange for valuable consideration--his salary--and under an employment-related obligation to do the very acts he claims were voluntary.
 
 
 20
 Fine nonetheless asserts that his provision of information was voluntary under the terms of the statute, and that, under the False Claims Act, the provision of information to the government is always voluntary unless compelled by subpoena. In support, he cites a single floor statement by Senator Grassley, the principal sponsor of the 1986 amendments, who stated that the voluntary disclosure requirement was intended to protect against actions in which the relator "was a source of the allegations only because the individual was subpoenaed to come forward." 132 Cong.Rec. 20,536 (1986).
 
 
 21
 This statement does not require us to conclude that Fine's provision of information was voluntary within the meaning of the False Claims Act. On its face, Senator Grassley's statement does not purport to describe the only situation in which the voluntary disclosure requirement would bar a qui tam suit following a public disclosure. Moreover, a single floor statement could not convince us to adopt so tortured a construction of a commonly understood word. Cf. Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."). We therefore decline to adopt Fine's proposed narrow construction of the voluntary provision requirement.
 
 
 22
 Fine next argues that we must construe his disclosures to be voluntary, because every federal employee labors under a duty to report fraud against the government, and we certainly cannot mean to establish a rule that would bar all federal employees from the universe of potential original sources.[5] He directs us to a 1989 Executive Order entitled "Principles of Ethical Conduct for Government Officers and Employees." This order establishes that "[e]mployees shall disclose waste, fraud, abuse, and corruption to appropriate authorities." Exec.Order No. 12,674, 54 Fed.Reg. 15,159, at Sec. 101(k) (1989). We need not decide the legal import of this order as a general matter, because the fact that Fine was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary.IV.
 
 
 23
 Our conclusion that Fine is not an original source may leave the underlying instances of alleged fraud unpoliced and unpunished so far as the False Claims Act is concerned. Our concern over this state of affairs is eased a bit, however, by the Government's predictions regarding the result of a contrary ruling. The United States warns that employees of the Office of the Inspector General would have the following perverse incentives:
 
 
 24
 [T]o spend work time looking for personally remunerative cases ... rather than doing their assigned work; to conceal information about fraud from superiors and government prosecutors so that they can capitalize on it for personal gain; to race the government to the courthouse to file ongoing audit and investigatory matters as qui tam actions before those cases have been sufficiently developed by the government to justify a lawsuit, thus prematurely tipping off the target, undermining the likely effectiveness of the case, and diverting unnecessarily up to 30% of the government's recovery to the government employee; and to use the substantial powers of the federal government conferred upon public investigators ... to advance their personal financial interests. Contractors will be deterred from cooperating with Inspector General investigations and audits because they fear, legitimately, that their confidential work papers will be appropriated by Inspector General employees for their personal use in filing qui tam actions, rather than for legitimate governmental functions. Criminal prosecutions will be seriously compromised, since IG employees are often the government's prime witnesses in criminal and civil fraud cases, and their personal interest in the outcome of their audits and investigations will make their testimony highly impeachable. Public confidence in the integrity and impartiality of government audits and investigations will necessarily decrease.
 
 
 25
 Amicus Brief of the United States in Support of Defendants-Appellees' Petitions for Rehearing and Suggestions for Rehearing En Banc at 8-9 (footnotes omitted).
 
 
 26
 The government's urgings convince us that our reading of the statute--albeit against an unanticipated factual background--is a sensible one. The government employed Fine to assist in its efforts to root out, disclose, and prevent fraud, and rewarded him with a salary and benefits. The government has no further need to rouse him from slumber and embolden him to perform his job responsibilities through the possibility of an enormous monetary recovery from a qui tam action. His performance of his job responsibilities, including the provision to his superiors of the information that later formed the basis of these two suits, was not voluntary within the meaning of the False Claims Act. He therefore is not an original source. Because both of his actions are based on publicly disclosed allegations or transactions, and because Fine was not an original source, we affirm the district court's dismissal of both suits.
 
 
 27
 THE PANEL OPINION IS VACATED; THE DISTRICT COURT'S JUDGMENT IS AFFIRMED.
 
 
 28
 KOZINSKI, Circuit Judge, with whom Judge T.G. Nelson joins, concurring:
 
 
 29
 I write briefly to comment on the linguistic issue raised by Judge Leavy's dissent. The majority holds that, for purposes of the False Claims Act, an individual does not act voluntarily if he is legally obligated to take a particular action. In Judge Leavy's view, an individual can act voluntarily even if he is legally required to do so. Neither view is implausible: Webster's New International Dictionary (second edition, of course) gives no fewer than eight definitions for "voluntary." Some are consistent with Judge Leavy's sense: "1. Proceeding from the will, or from one's choice or full consent; produced in or by an act of choice.... 4. Of or pertaining to the will; subject to, or regulated by the will...." Id. at 2858. Others support the majority: "2. Unconstrained by interference; unimpelled by another's influence.... 8. Law. Acting, or done, of one's own free will, without valuable consideration; acting, or done, without any present legal obligation to do the thing done, or any such obligation that can accrue from the existing state of affairs...." Id.
 
 
 30
 This is not unusual; courts often construe terms with more than one nuance of meaning. In McCulloch v. Maryland, 4 Wheat. (17 U.S.) 316, 413-21, 4 L.Ed. 579 (1819), to cite a famous example, the Supreme Court grappled with the "sense" in which the word "necessary" is used in the Necessary and Proper Clause, U.S. Const. art. I, Sec. 8 ("Congress shall have the power ... To make all Laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."). The word "necessary," Maryland argued, "limit[ed Congress's] right to pass laws ... to such as are indispensable, and without which the [enumerated] power[s] would be nugatory." Id. at 413. The Court avoided this linguistic trap: It noted that the word "has not a fixed character, peculiar to itself. It admits of all degrees of comparison.... A thing may be necessary, very necessary, absolutely or indispensably necessary." Id. at 414. Many laws Congress might pass pursuant to an enumerated power may be "essential to the beneficial exercise of the power, but not indispensably necessary to its existence." Id. at 415. Maryland's "narrow construction" would have a "baneful influence ... on all the operations of the government ... rendering [it] incompetent to its great objects." Id. at 417-18. The Court therefore rejected this "narrow construction" and held that "necessary" means, "plainly adapted to [the legislative] end." Id. at 421.
 
 
 31
 Here too, we are proffered a narrow construction of the term "voluntary," as reflected in Judge Leavy's dissent. But what are the consequences of adopting this construction? Under Judge Leavy's view, any action can be voluntary, even if the actor is subject to severe compulsion: When I hand my money to the armed man in the alley, my action is voluntary if I make an independent decision to do so (perhaps as an act of charity). Under this construction, voluntariness turns on the actor's state of mind: If he would have disclosed fraud to the government regardless of his legal obligation to do so, his action is voluntary; if he disclosed the fraud only because he was required to do so, it's not.
 
 
 32
 There are good reasons to reject this interpretation of "voluntary." First, it would be highly unusual to have a federal court's subject matter jurisdiction hinge on what's going on in someone's head, without any possibility of objective verification. So construed, the voluntariness requirement would be reduced to a formality, as it would be nearly impossible to refute a relator's assertion that he acted voluntarily, despite whatever legal or moral compulsion he might have been subject to.
 
 
 33
 Perhaps more important, the interpretation of "voluntary" embraced by Judge Leavy does nothing at all to further the purposes of the 1986 Amendments to the False Claims Act. The Amendments, as I read them, were designed to give incentives for disclosure to individuals who otherwise would have no reason to disclose and who might, in fact, suffer as a result. The Amendments surely weren't designed to force the government to pay for information to which it's already entitled. See United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 20 (1st Cir.1990), cert. denied sub nom., LeBlanc v. United States, 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991). Yet that is what Judge Leavy's interpretation of the term would do, by forcing the government to pay Mr. Fine for information it owns.
 
 
 34
 IG employees are, in fact, precisely the kind of people who should be excluded from bringing qui tam suits under the 1986 Amendments. The government pays salaries calculated to reward them for finding and turning over information about waste, fraud and abuse; it holds out the threat of discipline for failure to fulfill these duties; it imposes criminal sanctions for misusing or suppressing information obtained as part of an investigation. At the same time, IG employees are not subject to the types of pressures to withhold information that might burden employees of private companies, or other government employees. These other employees might well be risking their careers by coming forward with information about their superiors; IG employees are insulated from the agency's chain of command. See 5 U.S.C.A. app. 3 Secs. 2, 3(a), (b). Thus, it makes no sense at all to give IG employees additional incentives to come forward with information.
 
 
 35
 Were there no plausible interpretation of the term "voluntary" that would exclude IG employees, I might feel constrained to agree with the dissent. But, given that one of the dictionary definitions of "voluntary" is "acting without any present legal obligation," Judge Leavy is surely mistaken when he claims that the majority adopts "a contorted view of voluntariness." Dissent at 750.
 
 
 36
 I don't dispute that Judge Leavy's definition of "voluntary" is also legitimate. But I can't agree with his implicit assumption that this is the only legitimate construction of the term, or the right one for this statute. Because the majority's construction of "voluntary" falls comfortably within the range of meanings to which the term is susceptible, and because it is consistent with the purposes of the 1986 Amendments to the False Claims Act, I am pleased to join Judge Hall's majority opinion.
 
 
 37
 TROTT, Circuit Judge, with whom Judge Kozinski joins, concurring in the result:
 
 
 38
 Although I concur in the result reached by the majority, I arrive at that destination by a different analytical route, one that does not depend on the meaning in the statute of the word "voluntary."
 
 
 39
 Judge Hall is on target when she quotes Wang for the proposition that "[t]he paradigm qui tam plaintiff is the 'whistleblowing insider.' " Wang ex rel United States v FMC Corp., 975 F.2d 1412, 1419 (9th Cir.1992). Based on the record, she is also correct when she observes (1) that "[l]egislative history also suggests that Congress envisioned only this paradigm suit when enacting the current version of the qui tam provisions," and (2) that this case "defies the paradigm." But she stops here rather than taking the next logical step which is to reject out of hand Mr. Fine's claim that the statute can be abused for a fanciful purpose for which it was never intended.
 
 
 40
 When the provisions of the qui tam statutes are read in conjunction with the complementary provisions of the Inspector General Act, 5 U.S.C. app. 3, Sec. 1 et seq., one concludes that Congress could not have contemplated permitting a current or retired Inspector General employee to bring a lawsuit such as this for personal gain. To quote the government's sensible amicus brief, such a lawsuit would give "every government auditor a personal financial stake in matters that he is directed to pursue as part of his federal duties." The idea that Congress would countenance such a result without saying so strikes me as absurd. Why would Congress silently permit auditors like Inspector Fine to use their salaried jobs to set up private lawsuits when such auditors are also subject to a myriad of legal duties and responsibilities, all of which command independence and freedom from personal involvement in their work? Such provisions covering Inspector General employees prohibit the use of public office for private gain, 5 C.F.R. Secs. 2635.101(b)(7), 2635.702; the use of government property or government time for personal purposes, 5 C.F.R. Secs. 2635.704, 2635.705; the trafficking in "inside information" for personal advantage, 5 C.F.R. Secs. 2635.101(b)(3), 2635.703(a); the participation in any government matter in which the employee has a financial interest, 5 C.F.R. Secs. 2635.402, 2635.501, 2635.502; and last but not least, the holding of financial interests that may conflict with the impartial performance of government duties, 5 C.F.R. Sec. 2635.403. Government employees aren't even permitted to use "frequent flier miles" for personal use, but they can pursue lucrative qui tam lawsuits? All of this makes bizarre Mr. Fine's claim that he may use this statute to sue people and companies he previously investigated.
 
 
 41
 To construe the qui tam provisions as would the dissent, and as did the original panel, puts such provisions at war with the Inspector General Act when they must be read to complement each other. Permitting auditors to sue literally would destroy the government's anti-fraud and anti-waste programs. The "perverse incentives" outlined by the government and adopted by the majority exceed worrisome. Imagine, for example, an employee of the IRS bringing a qui tam lawsuit against a company that the employee had just audited on behalf of the government. Shades of the days leading up to the French Revolution of 1789 when taxes were collected by a private concern called the "Ferme Generale," or "Tax Farm." The first to be guillotined in the Place de la Revolution during the incarnadine Reign of Terror were the hated private tax collectors who made a profit by collecting more from the public than the amount needed by the government.[1] One day, Inspector Fine uses the awesome power of the federal government to investigate you; the next, Mr. Fine uses the information he pries loose from you with that power to augment his bank account. Can anyone say when Inspector Fine wields the coercive tools of the government that he is also not working for himself? Dr. Jekyll one day, Mr. Hyde the next. Such an abuse could only cause the public to distrust government officials even more than the public already does.
 
 
 42
 The mistake Judge Leavy makes in attempting to dismiss the government's "chamber of horrors" by claiming that the government can clean up any disaster by taking over an exemployee's lawsuit is a simple one: it overlooks the agency-wide conflict of interest muddle already made and the rest of the Inspector Fines who haven't yet filed. To quote the government, "Auditors' testimony in government fraud cases, upon which the government places substantial reliance in obtaining criminal convictions and civil judgments, will be subject to impeachment by reason of their potential personal financial interest in the outcome of their audits." (emphasis added). Just as the King's horses and the King's men discovered in the nursery rhyme, this mess would be impossible to unscramble. Moreover, presumably the government already had the opportunity to file such a suit and turned it down--just as happened in this case, unless it had been conveniently soft-pedaled by a wily auditor looking towards retirement. Must the government be expected to intervene in a lawsuit in which it has no confidence just to save itself from an errant employee?
 
 
 43
 When one reads everything pertaining to this issue, the answer comes through loud and clear: no one in Congress ever contemplated government employees like Mr. Fine bringing this kind of private lawsuit. The explanation for Congress' failure explicitly to prohibit such a possibility is that it is so far out in left field that no one anticipated that it might happen. Indeed, it is out of the stadium. Judge Leavy asks why Congress would want to turn down dollars recovered this way by an employee? That's the wrong question. The right one is why Congress with one hand would burden employees with conflict of interest rules, and then encourage them to violate those rules with the other?
 
 
 44
 Even were I to agree with the dissent that the majority's reading of this statute is strained, my conclusion would be the same. In this respect, I borrow a page from Justice Scalia's concurring opinion in Green v. Bock Laundry Machine Co., 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) where he says,
 
 
 45
 We are confronted here with a statute which, if interpreted literally, produces an absurd ... result.... I think it entirely appropriate to consult all public materials, including the background of Rule 609(a)(1) and the legislative history of its adoption to verify that what seems to us an unthinkable disposition was indeed unthought of.... [I]t would suffice to observe that counsel have not provided, nor have we discovered, a shred of evidence that anyone has ever proposed or assumed such a bizarre disposition.
 
 
 46
 See also Perry v. Commerce Loan Co., 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966) (when the construction of the words of a statute would lead to absurd or futile results, a court may look "beyond those words to the purpose of the act").
 
 
 47
 Justice Breyer endorses this approach in his 1991 Justice Lester W. Roth Lecture, 65 So.Cal.L.Rev. 845, 848 (1992). Justice Breyer says thatBlackstone himself, more than two hundred years ago, pointed out that a court need not follow the literal language of a statute where doing so would produce an absurd result. He said that if "collaterally ... absurd consequences, manifestly contrary to common reason," arise out of statutes, those statutes "are, with regard to those collateral consequences, void."
 
 
 48
 In summary, Mr. Fine's lawsuit runs aground not on a shoal, but on the very shores of the territory to which he lays claim. I vote to vacate the panel opinion and to affirm the district court's judgment.
 
 
 49
 MICHAEL DALY HAWKINS, Circuit Judge, concurrence in which Circuit Judge KOZINSKI joins:
 
 
 50
 Judge Hall pens a thoughtful opinion and reaches, I believe, an entirely correct result. I would get there via a somewhat different route. This is a case in which we are fundamentally called upon to reconcile two separate Acts of Congress sharing a common purpose: the investigation and reporting of allegations of fraud on the government. The district court should be affirmed because a side by side comparison of these two measures leads inescapably to the conclusion that Congress could not have intended that an auditor in the employ of an Inspector General--whose very job it is to detect and pursue allegations of fraud--should share in the substantial financial rewards intended for those who have no such job.
 
 
 51
 The policy implications which flow from concluding otherwise are frightening. Agents of the United States who are sworn to gather facts in a fair and neutral manner would, like the small town traffic magistrates of a thankfully bygone era, have a personal financial stake in the outcome of their efforts. Persons whose job it is to discover and report fraud to their supervisors would benefit from down playing the importance of their discoveries. Congress intended that inspectors general conduct professional inquiries and report the facts as they find them. As part of the effort to detect fraud, Congress also intended to enlist support from "whistleblowers"--persons outside the formal investigative structure. It is difficult to imagine that Congress, through the enactment of these two complementary measures, could have intended the creation of some sort of mad combination of the Sheriff of Nottingham and Inspector Clouseau.
 
 
 52
 LEAVY, Circuit Judge, with whom Circuit Judge REINHARDT joins, dissenting:
 
 
 53
 I dissent. There is a reason the majority has difficulty finding common ground for its holding that an Inspector General employee cannot be an "original source" for purposes of a qui tam action. Nothing in the False Claims Act or its legislative history suggests that an Inspector General employee may not bring a qui tam action.
 
 
 54
 To reach its result, the majority makes two assumptions: first, that Congress failed to consider Inspector General employees as possible qui tam relators, and, second, that, if Congress had considered them, it would have excluded Inspector General employees from the operation of the False Claims Act. It is not our role to legislate on behalf of Congress.
 
 
 55
 In addition, legislative history shows that, in amending the False Claims Act in 1986, Congress sought to encourage people to come forward with information regarding fraud so that it could recover monies lost to the treasury. False Claims Amendments Act of 1986; Senate Judiciary Committee, S.Rep. No. 345, 99th Cong., 2d Sess. 9 (1986), reprinted in 1986 U.S.C.A.A.N. 5266. The 1986 amendments were intended, in part, to encourage government employees voluntarily to disclose fraud by giving them "an opportunity to speak up and take action without fear and with some assurance their disclosures will lead to results." Id. at 5271. It is incongruous for the majority to read these amendments to bar a government employee, such as Fine, who reported the fraud to his supervisors and unsuccessfully urged them to act from bringing a qui tam action.
 
 
 56
 To encourage qui tam actions, Congress removed a broad jurisdictional bar and set forth a more specific and less restrictive set of jurisdictional bars. 31 U.S.C. Sec. 3730(e). These "[e]xclusions of federal jurisdiction, set out in the 1986 amendments to the False Claims Act, are unusually precise." United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1419 (9th Cir.1991). "A straightforward reading of the 1986 False Claims Act reveals that Congress did not explicitly exclude government employees from the class of proper qui tam relators." United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1503 (11th Cir.1991); accord Hagood, 929 F.2d at 1420. Neither did Congress explicitly exclude Inspector General employees. Why would Congress? Why would the Government be less willing to take dollars recovered by an Inspector General employee than by any other government employee or by any other person?
 
 
 57
 To effect the assumed desire of Congress, the majority holds that Inspector General employees do not qualify as original sources because their provision of information to the Government is not voluntary as required by statute: "the provision of information when one has a legal duty to do so renders the performance of that duty nonvoluntary." This is a contorted view of voluntariness. I have a legal duty not to jay walk. Does that make my failure to jay walk a nonvoluntary act? Our lives are circumscribed with legal duties. That does not make our choices to perform such duties nonvoluntary acts.
 
 
 58
 It is quite clear why Congress included the "voluntarily" language in the statute. Senator Grassley, the principle sponsor of the 1986 amendments to the False Claims Act, explained the reason on the floor of the Senate. He stated that the purpose was to prevent qui tam actions by a person who is a "source of the allegations only because the individual was subpoenaed to come forward." 132 Cong.Rec. 20,536 (1986). Senator Grassley's remarks provide the only reasonable interpretation of the meaning of the word "voluntarily." The majority's interpretation of the term "voluntarily" is not a reasonable one because it assumes--unnecessarily--that Congress chose a most unlikely and unduly complicated way to achieve a very simple objective. The majority does not explain why Congress did not simply say that some or all government employees are barred from filing qui tam actions, if that was its intent, instead of creating an implicit bar through the requirement that a disclosure be made "voluntarily." The majority's interpretation is made all the more implausible by its admission that Congress might well not have realized that its use of the word "voluntarily" would have the effect that the majority gives to it here.
 
 
 59
 Finally, in Section IV the majority ignores an area where Congress has acted. To justify leaving some instances of fraud unpoliced and unpunished, the majority evokes the veritable chamber of horrors which might develop if Inspector General employees were permitted to bring qui tam actions. Congress took care of this. Congress gave the Attorney General control over any qui tam litigation if she, after being served with a copy of the complaint as required by statute, enters an appearance within sixty days of such service. 31 U.S.C. Sec. 3730(b)(2). "If the Government proceeds with the action, the action is conducted only by the Government." Id. at 3730(b)(3).
 
 
 60
 In response to the parade of horribles that some would portray, I would add that I do not believe that Fine or any other government employee enjoys unfettered freedom to file qui tam actions under any and all circumstances. Whether the information on which government employees would base their suits is public or not, they owe their employer or ex-employer a duty of loyalty under common law, as well as a host of related duties under statutes, regulations, and professional codes of ethics. Just as under common law an employee cannot pursue a business opportunity he learned of through his job without notifying his employer of that opportunity and giving his employer a chance to pursue that opportunity, General Automotive Mfg. Co. v. Singer, 19 Wis.2d 528, 120 N.W.2d 659 (1963), so a government auditor may not file a qui tam action based on information he learned through his job without first giving the government an opportunity to act on the allegations itself. Such common law, statutory, regulatory and ethical obligations--not a strained reading of the word "voluntarily"--are sufficient to meet the concerns raised by my colleagues. In any event, not only are Fine's qui tam actions not barred by the provisions of statute, but permitting qui tam actions such as Fine's would further the purpose of the statute--ferreting out fraud and recovering money for the federal coffers.
 
 
 61
 The False Claims Act says "a person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. Sec. 3730(b). Nothing in the Act bars an Inspector General employee, or any other government employee, from bringing the action. I would allow Fine to proceed with his claims.
 
 
 
 [1]
 The panel opinion, which we hereby vacate, was reported at 39 F.3d 957 (9th Cir.1994)
 
 
 [2]
 Fine also has filed actions against his former employer seeking documents under the Freedom of Information Act. See Fine v. United States Dep't of Energy, 823 F.Supp. 888 (D.N.M.1993) (24-page opinion disposing of Fine's document requests relating to alleged fraud by the accounting firm Peat, Marwick); Fine v. United States Dep't of Energy, 830 F.Supp. 570 (D.N.M.1993) (ruling on various motions involving Fine's FOIA requests). Presumably, Fine is seeking documentation to support currently pending or yet-to-be-filed qui tam actions
 
 
 [3]
 Recall, in this light, that the False Claims Act provides a statutory fine of between $5,000 and $10,000 for every false claim submitted to the government, as well as triple compensatory damages. The relator is entitled to share in as much as 30% of the settlement or judgment depending on whether the United States intervenes in the action. Thus, potential recoveries for qui tam relators are staggeringly large, as well they should be for insiders in private companies who risk their jobs and reputations when they blow the whistle on their own employers. We question whether government auditors, who already receive a salary and benefits for reporting allegations of fraud, deserve or need this same incentive
 
 
 [4]
 We have in the past relied on common-sense definitions to parse the terms of the qui tam provisions. In Hagood, for instance, we rejected in dicta the Government's proposal that "public disclosure" occurs when "a government employee 'disclosed' to himself as a member of the public the information on which he based his suit." Hagood, 929 F.2d at 1419. We labelled the proposition "too metaphysical a contention for the interpretation of a plain congressional enactment." Id. We similarly decline today to embark on a philosophical inquiry into the meaning of "voluntary."
 
 
 [5]
 In Hagood, 929 F.2d 1416, we implicitly accepted the proposition that a federal employee may bring a qui tam action. We have never addressed, however, whether federal employees might be excluded as a class from qualifying as original sources. We leave this question as well, for another day
 
 
 [1]
 Will and Ariel Durant, The Story of Civilization, Vol. 10, Rousseau and Revolution 935-36 (1967); Stephen Jay Gould, Bully for Brontosaurus 360-63 (1991)