**UNITED STATES of America, ex rel. Mervyn A. SCHWEDT, Plaintiff/Relator,**

v.

**PLANNING RESEARCH CORP., INC., Defendant.**

**No. Civ.A. 92–1951–LFO/DAR.**

United States District Court, District of Columbia.

March 11, 1999.

William G. Kopit, John A. Murdock, Washington, D.C., for Mervyn A. Schwedt, plaintiff.

Frederic M. Levy, Victoria A. McEneney, Gregory T. Jaeger, Joanne L. Zimolzak, McKenna & Cuneo, L.L.P., Washington, DC, Schwedt, C.A., for defendant.

Frank W. Hunger, Assistant Attorney General, Wilma Lewis, United States Attorney, Anthony M. Alexis, Assistant United States Attorney, Washington, D.C., Michael F. Hertz, Polly A. Dammann, Jamie Ann Yavelberg, Attorneys, Civil Division, Commercial Litigation Branch, Washington, D.C., for amicus curiae.

## ORDER

OBERDORFER, District Judge.

For the reasons stated in an accompanying Memorandum, it is this 11th day of March, 1999, hereby

ORDERED: that plaintiff/relator's motion for leave to file an amended complaint [188] is GRANTED; and it is further

ORDERED: that defendant's motion to strike plaintiff/relator's motion for summary judgment [207] is DENIED; and it is further

ORDERED: that defendant's motion to dismiss for lack of subject-matter jurisdiction [205] is GRANTED; and it is further

ORDERED: that defendant's motion to dismiss on constitutional grounds [202] is DENIED AS MOOT; and it is further

ORDERED: that the parties' cross-motions for summary judgment [203, 204] are DENIED AS MOOT.

## MEMORANDUM

Mervyn Schwedt, former director of the Pension and Welfare Benefits Administration's ("PWBA") Office of Information Management,[1] filed this suit against Planning Research Corporation, Inc. ("PRC") on August 24, 1992. In his complaint, Schwedt alleged that PRC violated the False Claims Act, 31 U.S.C. §§ 3729–3733, in its performance of a government contract. That contract, which became effective September 22, 1989, called for PRC to develop the software subsystem for a Field Office Information System ("FOIS") for the PWBA. The contract stipulated that PRC would submit twenty specified deliverables during the course of the project, and that the government would remit a specified payment upon acceptance of each deliverable.

The government accepted and paid for sixteen of the specified deliverables. PRC submitted the other four deliverables together on both June 8, 1990 and December 7, 1990; the government rejected the entire set on both occasions. A third submission of the four deliverables came on May 17, 1991, after which the government accepted and paid for one of the four items. PRC resubmitted the remaining three items on September 13, 1991, prompting the government to reject them and to issue a stop work order. PRC has performed no work on the contract since the order, but has requested two "equitable adjustments" totaling $2.1 million. Schwedt, who was responsible for managing the FOIS contract, filed this suit alleging that PRC "knowingly on no less than four occasions present[ed] ... non-functional and non-compliant software ... while wrongfully and knowingly misrepresenting [in progress reports] that said software was compliant and functional." Compl. at ¶ 25. The United States Department of Justice conducted an investigation, but declined to intervene. 31 U.S.C. § 3730(b)(4)(B).

An Order of March 31, 1994 dismissed the complaint for failure to state certain claims with the requisite specificity, and for failure to state a claim that the United States suffered damages as a result of the allegedly false progress reports. *United States ex rel. Schwedt v. Planning Research Corp., Inc.*, 1994 WL 118222 (D.D.C. Mar.31, 1994). The court of appeals remanded for consideration of whether the allegedly false progress reports indeed caused the government damage. *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196 (D.C.Cir.1995). After discovery concluded, Schwedt filed a motion for leave to file a first amended complaint. The proposed amended complaint joins two individual defendants, and adds two substantive claims: that PRC made false claims by submitting inaccurate cover letters to accompany the incomplete software; and that PRC made false claims by requesting the equitable adjustments in 1991 and 1992. PRC opposes the motion for leave to file the amended complaint, arguing, *inter alia*, that it exceeds the scope of the court of appeals' mandate. While that motion was pending, PRC filed a motion to dismiss for lack of subject-matter jurisdiction, a motion to dismiss on constitutional grounds,

---

1. The PWBA is part of the Department of Labor.

and a motion for summary judgment. Schwedt also filed a motion for summary judgment, which PRC moves to strike because it is predicated on the proposed amended complaint, leave for which to file has not been granted. On December 14, 1998, the United States filed an amicus brief in response to the parties' dispositive motions. The parties filed responses to the government's brief on January 19, 1999, and a hearing was held on February 10. For purposes of this memorandum, the amended complaint will be treated as having been filed.

## I.

PRC first moves to dismiss on jurisdictional grounds, arguing that Schwedt's suit fails to satisfy the False Claims Act's so-called public disclosure provision. That provision, which was part of the 1986 amendments to the Act, establishes that courts lack subject-matter jurisdiction for *qui tam* suits that are

> based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The statute defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B). Pursuant to *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675, 681 (D.C.Cir. 1997), courts assessing whether the jurisdictional bar applies first must determine whether the "allegations or transactions" upon which a *qui tam* suit is based were "publicly disclosed," *id.* at 681; if they were, the court then must analyze whether the relator is an "original source." *Id.*

## A.

The public disclosure prong of § 3730(e) has two discrete criteria: there must be a "public disclosure of allegations or transactions;" and the *qui tam* suit must be "based upon" the public disclosure. 31 U.S.C. § 3730(e)(4)(A).

## 1.

PRC argues that a government audit report issued five months before Schwedt filed this suit constitutes a "public disclosure of allegations or transactions." The report, prepared for and released by the Office of Inspector General ("OIG") of the Department of Labor, assessed the project to develop a Field Office Information System.[2] In preparing the report, the outside accounting firm "reviewed the documentation provided PWBA by the contractor and reviewed portions of the acceptance testing process." Report at 3. The report noted that "[a]fter two years of work, PWBA ... rejected the Field Office access system and Case Management Information System software." *Id.* at 1. It concluded that PRC's "unsatisfactory" performance in developing the software subsystem for the FOIS "was a significant factor in the system development failure." *Id.* at 3.

The report documented the four software deliveries at issue in Schwedt's complaint, as well as the government's subsequent testing and rejection of them. According to the report, the first delivery was made on June 8, 1990, after the government "revised the delivery date to allow the contractor time to solve" problems that had arisen. *Id.* The initial delivery was reviewed, but the government was not able to test it, prompting its re-

---

2. The report was titled, "PWBA's ERISA Information System: Development Problems Delay FOIS Implementation." The report was prepared by Hazlett, Lewis & Bieter, a public accounting firm, and was issued by the Department of Labor on March 31, 1992.

jection because it was "substantially incomplete." *Id.* The report indicates that PRC made the second delivery on December 7, 1990, "knowing that all modules of telecommunications software were not included in the delivered product." *Id.* (emphasis added). The flaws of the second delivery "prevented complete testing;" meanwhile, the government discovered other problems including "missing edit checks and faulty form approval processes," prompting rejection of the second delivery. *Id.*

The third delivery was received on May 17, 1991, and underwent "extensive testing." *Id.* According to the report, the PWBA concluded after testing that "the software did not meet contractual requirements." *Id.* After PWBA reported 367 errors and omissions in the delivery, the General Services Administration issued, though later rescinded, a "show cause" letter to the contractor. *Id.* The final delivery was made on September 13, 1991, but likewise was rejected "because of the number of critical problems"—including 226 reported errors and omissions—"found during acceptance testing" *Id.* Rejection of the fourth delivery prompted a stop work order. The audit report documented that PWBA had "disbursed $803,811" to PRC under the contract, that PRC had filed a "Request for Equitable Adjustment" for $657,000, and that PRC "stated [that it would] file additional claims." *Id.* at 18. Having determined that PRC "did not adequately test the software before delivery," *id.* at 15, the report concluded that "[t]he contractor delivered the software late and ultimately failed to deliver a software system that meets contractual requirements." *Id.* at 4.

The parties do not dispute that the OIG audit report was a "public disclosure," or that its issuance pre-dated Schwedt's *qui tam* suit. Rather, they disagree about

whether the audit report disclosed "allegations or transactions" as contemplated by 31 U.S.C. § 3730(e)(4)(A). In *United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645 (D.C.Cir. 1994), our court of appeals explained "allegations or transactions" with the following equation: X + Y = Z, with Z representing the allegation of fraud and X and Y representing its essential elements. *Id.* at 654. According to the *Springfield Terminal Railway* court, the jurisdictional bar applies if "either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *Id.* When one of these conditions is met, it is presumed that "the information conveyed [to the government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing . . . ." *Id.* (quoting *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1377 (D.C.Cir. 1981)) (alteration in original). Thus,

> [w]hen the publicly disclosed transaction is sufficient to raise the inference of fraud (X + Y are in the public domain), there is "little need for qui tam actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue."

*United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.1997) (quoting *Springfield Terminal Railway,* 14 F.3d at 654) (parentheses in original).

■ Information in the OIG audit report satisfied this standard. The report did not conclude explicitly that PRC submitted false or fraudulent claims for payment—and therefore did not disclose the "Z" of the *Springfield Terminal Railway* equation.[3] However, the report revealed

3. Schwedt argues that the jurisdictional bar cannot be triggered in the absence of such an allegation. Opp. at 22–24. This overlooks the disjunctive nature of § 3730(e)(4)(A), which defines a public disclosure as revealing *either* allegations *or* transactions. Further, that the government declined to bring suit against PRC, and that it declined to intervene

that on four separate occasions PRC submitted deliverables that ultimately were rejected by the government. Report at 3. The report further documented that the government considered one of the submissions "substantially incomplete," that it found others to contain 367 and 226 errors, respectively, and that PRC submitted the remaining deliverable with knowledge that it was not complete. *Id.* As a matter of law, the report disclosed the "X" and "Y" of the alleged fraud: It detailed the "critical elements" of the allegedly fraudulent transactions, *Springfield Terminal Railway*, 14 F.3d at 654, by documenting the alleged perpetrator, the flawed deliveries, the attendant requests for payment, and knowledge on the part of PRC that at least one delivery was not complete. *See id.* at 655 ("Fraud requires recognition of two elements: a misrepresented state of facts and a true state of facts."). Considered in the light of *Findley*, where the jurisdictional bar was triggered by a disclosure that did not reveal a specific transaction or a specific alleged perpetrator, 105 F.3d at 688, the disclosures in this case support the ready inference of fraudulent conduct, and therefore satisfy § 3730(e)(4)(A).

The nature of the disclosures also distinguish this case from *Springfield Terminal Railway*. The disclosure in that case consisted of telephone records and payment vouchers obtained through civil discovery. The court in *Springfield Terminal Railway* characterized the vouchers as "facially valid," and described the phone records as not suggestive of "any misrepresentation on [the defendant's] part." 14 F.3d at 656. Having determined that neither the "X + Y" nor the "Z" of the theoretical equation had been disclosed, the court concluded that "the information put in the public domain by the discovery filing did not

present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction upon which a qui tam suit could be based." *Id.* By contrast, the OIG audit report specifically documented that PRC submitted flawed products while certifying their completeness, and alleged that in one case PRC was aware that the product was not compliant. Thus, unlike in *Springfield Terminal Railway*, where the disclosure lacked legal value unless one had both prior suspicion of wrongdoing and "personal experience" with the case, *id.*, here the OIG report, standing alone, contained a "substantial ... indication of foul play." *Id.* It therefore was sufficient "to set government investigators on the trail of fraud," and to enable them to investigate the matter further. *Id.* at 655. As a matter of law, then, it constituted a public disclosure of "allegations or transactions" within the meaning of § 3730(e)(4)(A).

### 2.

■ PRC further contends that Schwedt's suit is "based upon" the "allegations or transactions" in the OIG audit report. This position is fully supported by circuit precedent. In *Findley*, our court of appeals established that the statutory phrase "based upon" means "supported by," not "derived from." 105 F.3d at 682. Here, Schwedt alleges that PRC made knowingly false claims about the status and progress of the FOIS project and interim deliverables. These allegations clearly are "supported by" the OIG audit report, which concluded, *inter alia*, that PRC made at least one software delivery—a request for payment under the contract—knowing that it was incomplete. *See* Report at 3. That Schwedt's complaint

in the instant case, does not *a fortiori* preclude the OIG audit report from being a public disclosure. As the court recognized in *Springfield Terminal Railway*, qui tam suits are jurisdictionally barred when public disclosure of the transactions is sufficient to raise the inference of fraud for the specific reason that "the government presumably has chosen

not to pursue" the case. 14 F.3d at 654. *See also United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir.1995) ("[P]ublic disclosure of the material elements of the fraudulent transaction bars qui tam actions even if the disclosure itself does not allege any wrongdoing.").

may level additional charges does not preclude the conclusion that his "complaint repeats what the public already knows...." *Findley*, 105 F.3d at 683. As a result, Schwedt's suit is "based upon" the prior public disclosure of allegations or transactions concerning PRC's work on the FOIS project, thereby satisfying § 3730(e)(4)(A).

Schwedt argues that because his central charge is that PRC made false statements to the government in violation of 31 U.S.C. § 3729(a)(2), his *qui tam* suit cannot be "based upon" an audit report that considered only whether PRC made fraudulent or false *claims* in violation of § 3729(a)(1). Opp. at 21–22. This distinction is not persuasive. Allegations of false progress reports describe transactions "substantially similar" to submission of knowingly incomplete software—all involve misrepresentations made in the course of performance of the FOIS contract—such that the former are "supported by" evidence of the latter. *Findley*, 105 F.3d at 682. In other words, since 31 U.S.C. § 3729(a)(2) penalizes a knowingly false "statement [made] *to get a false or fraudulent claim paid or approved by the Government*," § 3729(a)(2) (emphasis added), progress reports, without more, are not conclusive proof of a § (a)(2) violation: they must be coupled with evidence that statements in the progress reports were made in order to induce payment for a false or fraudulent claim—in this case, the incomplete deliverables. Evidence of the incomplete deliverables therefore necessarily supports allegations of false statements in the progress reports; as our court of appeals wrote in 1995, "if, as Schwedt alleges, PRC knowingly submitted false progress reports stating that the software delivered during the same period was complete when in fact it was not, then these progress reports would constitute false statements in support of false claims...." *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C.Cir.1995).

■ Furthermore, PRC's progress reports play a crucial role in Schwedt's suit, but they do not constitute the universe of its allegations: The amended complaint contains six counts alleging *false claims*, and only one count alleging *false statements*. Schwedt's suit therefore fits comfortably within the principle that the False Claims Act's jurisdictional bar precludes suits by "individuals who base *any part of their allegations* on publicly disclosed information." *United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998) (emphasis added). *Cf. Springfield Terminal Railway*, 14 F.3d at 655 ("[W]here all of the material elements of the fraudulent transaction are already in the public domain," relator's production of "additional evidence incriminating the defendant" cannot clear the jurisdictional hurdle). Finally, by raising the "specter of foul play," *Findley*, 105 F.3d at 687 (internal quotation marks omitted), evidence of PRC's delivery of knowingly noncompliant software clearly "enable[d] the government to adequately investigate the case," *id.* at 688, which logically would involve examination of the allegedly false progress reports. The foregoing considered, Schwedt's suit as a matter of law is "based upon the public disclosure of allegations or transactions," and thus is barred by 31 U.S.C. § 3730(e)(4)(A).

### B.

This conclusion does not end the inquiry. 31 U.S.C. § 3730(e)(4)(B) relaxes the jurisdictional bar if the relator is an "original source"—"an individual who has direct and independent knowledge of the information on which the allegations are based *and* has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). PRC contends that Schwedt meets neither criterion.

#### 1.

■ PRC concedes that Schwedt's knowledge of the "allegations or transactions" was independent of the public disclosure, but argues that it was not direct because he learned of the information from subordinates and outside contractors. Schwedt counters that even if he did not obtain all of the information on his own, his knowledge was direct because it was "marked by absence of an intervening agency," *Springfield Terminal Railway,* 14 F.3d at 655 (internal citation omitted), as the individuals who reported the "allegations or transactions" to him worked under his supervision. This argument is unavailing. Our court of appeals invoked the phrase "marked by absence of an intervening agency" in its *Springfield Terminal Railway* opinion, *see id.* (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991)), but it subsequently asserted in *Findley* that direct knowledge is "first-hand knowledge." 105 F.3d at 690. This construction forecloses Schwedt's claim that knowledge he obtained from subordinates or outside contractors was "direct."

■ Even knowledge that Schwedt may have obtained first-hand is not "direct . . . knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B). To satisfy this standard, Schwedt's knowledge must be "of any essential element of the underlying fraud transaction," *Springfield Terminal Railway,* 14 F.3d at 657, which is either the "misrepresented state of facts" or the "true state of facts." *Id.* at 655. Schwedt has not demonstrated that he possessed such information. He argues that he had some first-hand knowledge because he "participated personally in limited but important testing" of PRC's deliverables,

Opp. at 27 n. 14, because he heard PRC make "oral representations regarding software development," and because he "reviewed the progress reports." *Id.* at 27.[4] Yet Schwedt does not explain how the deliverables he tested, the oral representations he heard, or the progress reports he reviewed provided him with information of either a misrepresented or true state of facts. For example, he does not assert that the deliverables he tested were non-compliant, or that the representations he heard were false; he likewise does not specify progress reports that he reviewed that contained misrepresentations. As a result, Schwedt has not shown that the limited information he obtained first-hand constituted "direct" information within the meaning of § 3730(e)(4)(B). He therefore fails to satisfy the first prong of the disjunctive original source standard.

#### 2.

Even assuming direct knowledge, PRC argues that Schwedt did not "voluntarily provide[ ] the information to the Government before filing" his *qui tam* suit. 31 U.S.C. § 3730(e)(4)(B). First, PRC contends that as a matter of fact Schwedt did not come forward with the information, and that when asked by government investigators he failed to offer adequate cooperation. Second, PRC argues that as a matter of law Schwedt could not have provided information "voluntarily" because, as a management-level employee, he was duty-bound to disclose any information that he obtained concerning alleged fraud.[5] Schwedt disputes the allegation that he failed to come forward with the information. He also argues that case law holding that employees could not have "voluntarily" provided information to the government is not controlling here.

---

4. Schwedt did not pursue this argument at the February 10 hearing.

5. In its amicus brief, the United States supported this argument. It took no position on

the other aspects of PRC's motion to dismiss for lack of subject-matter jurisdiction because as a non-intervening party it did not engage in affirmative discovery.

■ Defendant has the better of this argument. As director of the PWBA's Office of Information Management, Schwedt had, by his own admission, "primary responsibility" for developing a Field Office Information System ("FOIS"). Opp. at 26. This entailed not only managing the contractor (PRC), but also supervising employees who, working "under [his] direction," tested the software delivered by the contractor. *Id.* at 26–27. Schwedt also "provided periodic written reports and frequent (daily) . . . reports to [his] supervisors regarding project status." Subm. of 2/9/99 at 2 (parentheses in original). By definition, then, Schwedt performed a management role that obligated him to alert superiors to any suspicions of contractor wrongdoing that threatened to impede development of the FOIS.

This case therefore is closely analogous to, if not indistinguishable from, those in which government auditors were held as a matter of law not to have "voluntarily" provided information to the government because of the inherent nature of their duties and responsibilities. *See, e.g., United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 744 (9th Cir.1995) (en banc); *United States ex rel. Foust v. Group Hospitalization and Med. Serv., Inc.,* 26 F.Supp.2d 60, 73 (D.D.C.1998). As the Ninth Circuit wrote in Fine, employees such as Schwedt who have managerial authority can "no more voluntarily provide[ ] information to the government than . . . federal judges . . . voluntarily hear arguments and draft dispositions." *Fine,* 72 F.3d at 743–44. *See also United States ex rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. Univ.,* 161 F.3d 533, 540–43 (9th Cir.1998) (applying same analysis to administrative contracting officer); *United States ex rel. Reagan v. Marovic,* 97–3063, at 5 (N.D.Cal.1998). *Cf. Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1476 (9th Cir.1996) (holding that government contracting lawyer was an origi-

nal source); *id.* at 1479–80 (Kleinfeld, J., concurring) (disagreeing that lawyer was an original source). Just as an auditor's investigative duties require her to report suspected fraud, Schwedt's managerial responsibility to implement a Field Office Information System obligated him to report suspected contractor wrongdoing. As a matter of law, he could not have "voluntarily" provided to the government information concerning alleged fraud, and thus cannot qualify as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B).[6]

Schwedt argues that this conclusion subverts the False Claims Act because if he could not have "voluntarily" provided information to the government, then *no* government employee ever could, as all are required by executive order to "disclose waste, fraud, abuse, and corruption. . . ." Opp. at 28 (citation omitted). This is not persuasive. That Schwedt was a high-level manager vested with primary responsibility over a vast project, and that he learned of the alleged fraud in the course of performing his managerial duties, easily distinguish this case from that of other, differently situated, federal employees. Furthermore, Schwedt concedes that he was bound by Department of Labor regulations that made "[a]ll DOL employees . . . responsible for . . . [p]romptly reporting . . . information that they reasonably believe indicates wrongdoing," which was defined to include "[s]ubmission of false claims or fraudulent statements by employees, contractors, grantees or others doing business with DOL." DLMS § 713, 704, Mot. to Dismiss Ex. C–14; Depos. of Mervyn Schwedt, Vol. IV, at 584–85, Mot. to Dismiss Ex. C–12A (agreeing that he "had no choice" but to report suspected contractor wrongdoing). Thus, whether *all* federal employees are precluded from "voluntarily" providing information to the government, and whether such a result would subvert the purpose of the 1986

---

6. This conclusion obviates consideration of PRC's contention that as a matter of fact

Schwedt did not "voluntarily" provide the information to the government.

amendments to the False Claims Act, need not be addressed.[7]

In view of the foregoing, PRC has established that subject-matter jurisdiction is lacking because Schwedt was not an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B). Accordingly, its motion to dismiss will be granted.

## II.

PRC's motion to dismiss on constitutional grounds argues: 1) that the *qui tam* provisions of the False Claims Act violate the Appointments Clause of Article II of the United States Constitution; 2) that such provisions violate separation of powers principles; and 3) that relator lacks Article III standing. While each of these arguments has been rejected by several courts of appeals, *see, e.g., United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1213–14 (7th Cir.1995), *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1041 (6th Cir.1994), the Supreme Court has instructed courts to "decid[e] statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). *See also Hagans v. Lavine*, 415 U.S. 528, 549, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). In view of the analysis of the motion to dismiss for lack of subject-matter jurisdiction, *see infra* I, PRC's motion to dismiss on constitutional grounds need not be addressed, and will be denied as moot.

## III.

Both parties also have filed cross-motions for summary judgment, which, in view of the foregoing, *see infra* I, likewise will be denied as moot.

An accompanying order implements the decisions announced herein.

---

**7.** Schwedt relies on one floor statement by the principal Senate sponsor of the 1986 amendments to argue that the voluntariness requirement was not intended to foreclose a *qui tam* suit in a situation like the instant case. This precise argument, however, has been squarely rejected. *See United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 744 (9th Cir.1995) (en banc).