**UNITED STATES of America ex rel. Steven M. FOUST and Richard A. Gedrich, Plaintiffs,**

v.

**GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., d/b/a Blue Cross and Blue Shield of the National Capital Area, et al., Defendants.**

Civil Action No. 93–2285(NHJ).

United States District Court, District of Columbia.

Sept. 8, 1998.

James Feldesman, Feldesman, Tucker, Leifer, Fidell & Bank, Washington, DC, for Steven M. Foust, Richard A. Gedrich.

Suzanne Claire Nyland, U.S. Attorney's Office, Washington, DC, for United States Government.

Robert K. Huffman, Miller, Chevalier, Chartered, Washington, DC, for Group Hospitalization and Medical Services, Inc.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, for Arkansas Blue Cross and Blue Shield, Blue Cross of California, Blue Cross & Blue Shield of Delaware, Blue Cross & Blue Shield of Georgia, Inc., Blue Cross & Blue Shield of Illinois, Blue Cross & Blue Shield of Iowa, Blue Cross & Blue Shield of Maryland, Inc., Blue Cross & Blue Shield of Michigan, Blue Cross & Blue Shield of New Hampshire, Blue Cross & Blue Shield of North Carolina, Blue Cross & Blue Shield of Utah, Blue Cross & Blue Shield of Virginia, Blue Cross & Blue Shield United of Wisconsin, Blue Cross & Blue Shield of Oklahoma.

Jacqueline Marie Saue, Foley & Lardner, Washington, DC, Charles J. Steele, Washington, DC, for Co/Blue Cross.

Arvid Edward Roach, II, Jay T. Smith, Covington & Burling, Washington, DC, for Blue Cross and Blue Shield of Florida, Inc.

Daniel Edward Toomey, Thompson, Hine & Flory, L.L.P., Washington, DC, Karen Natalie Walker, Kirkland & Ellis, Washington, DC, for Blue Cross & Blue Shield of Kentucky.

Daniel Edward Toomey, Thompson, Hine & Flory, L.L.P., Washington, DC, for Blue Cross & Blue Shield of New Jersey, Inc., The Community Mutual Ins. Co.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, Mark Hoton, Verrill & Dana, Portland, OR, for Blue Cross & Blue Shield of Maine.

David Pickle, Kilpatrick & Stockton, L.L.P., Washington, DC, for Blue Cross and Blue Shield of Massachusetts, Inc.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, Christopher A. Shapely, Brunini, Grantham, Grower & Hewes, PLLC,

Jackson, MI, for Blue Cross & Blue Shield of Mississippi, Inc.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, John I. Houseal, Jr., Glanker, Brown, Gilliland, Chase, Robinson & Raines, Memphis, TN, for Blue Cross and Blue Shield of Kansas City, Blue Cross & Blue Shield of Missouri, Blue Cross and Blue Shield of Memphis.

James Jennings Regan, Warren Jay De-Vecchio, Kenneth M. Bruntel, Shauna E. Alonge, Crowell & Moring, L.L.P., Washington, DC, for Blue Cross Blue Shield of North Dakota.

. Lee Thomas Ellis, Jr., Baker & Hostetler, L.L.P., Washington, DC, Karen Natalie Walker, Kirkland & Ellis, Washington, DC, Randall S. Rabe, Baker & Hostetler, L.L.P., Columbus, OH, for Central Benefits Mutual Ins. Co.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, Steven J. Fram, Mark J. Oberstaedt, Archer & Greiner, P.C., Haddonfield, NJ, for Capital Blue Cross.

Thomas Joseph O'Brien, Morgan, Lewis & bockius, L.L.P., Washington, DC, Alexander Kerr, Washington, DC, for Independence Blue Cross.

Mitchell J. Lazris, Hogan & Hartson, L.L.P., Washington, DC, Richard E. Dunne, III, Hogan & Hartson, L.L.P., Baltimore, MD, for Blue Cross of Northestern Pennsylvania.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, Chief Judge.

Former federal government auditors Steven M. Foust and Richard A. Gedrich bring this action under the qui tam provisions of the False Claims Act. This is an action for statutory civil penalties and damages arising out of alleged violations of 31 U.S.C. § 3729. All defendants have moved to dismiss Foust and Gedrich's second amended complaint and the United States has moved to dismiss Foust and Gedrich from this action.

The False Claims Act allows a private plaintiff to make a claim on behalf of himself

and the United States for violation of the Act. 31 U.S.C. § 3730(a). Such plaintiffs, including Foust and Gedrich, are called "relators." Qui tam relators are entitled to receive part of any government recovery when suit is brought. The government investigates the complaint to determine whether to intervene in the action; if it declines to do so, the private plaintiff, or relator, may proceed with the action alone. 31 U.S.C. § 3730(b)(4). In this case, after a lengthy investigation, the government elected to intervene in only part of the relators' case.

In order for qui tam relators to proceed without the government's intervention, they must meet the jurisdictional requirements laid out in 31 U.S.C. § 3730(e). Here, the government has elected not to intervene in the claims that now constitute relators' second amended complaint. The Court finds that it lacks subject matter jurisdiction to hear relators' allegations and will grant defendants' motions to dismiss relators' complaint and the United States' motion to dismiss relators from this action. The portion of the case in which the government chose to intervene will remain before the Court.

## I. Background

Relators originally filed their claims under seal on November 4, 1993, and their complaint remained under seal pursuant to 31 U.S.C. § 3730(b) while the government determined whether to intervene. On October 31, 1996, the government notified the Court that it was intervening in part and declining to intervene in part and the case was unsealed at that time.

### A. The Defendants

Defendants in this case are Blue Cross Blue Shield of the National Capital Area ("BCBSNCA"), also known as Group Hospitalization and Medical Services, Inc., and several individual Blue Cross Blue Shield organizations.[1] The individual organizations are known as "participating plans" and BCBSNCA is known as the "control plan." The participating plans provide health insurance benefits to local individuals who subscribe to the plans. They also maintain national accounts for employers whose employees are located within the service areas of other individual Blue Cross Blue Shield plans. All participating plans' national accounts are administered by a control plan, BCBSNCA. BCBSNCA reimburses the participating plans for health benefits they pay out and other costs they incur in administering national accounts.

Defendants BCBSNCA and the participating plans negotiate agreements with the institutional health care providers that serve the insured individuals who subscribe to defendants' insurance plans. Under these negotiated agreements, the participating plans reimburse the health care providers—primarily hospitals, nursing homes, and home health care agencies—for the medical services they render to the subscribers. The health care providers also agree to give the participating plans discounts, refunds, or rebates on those medical services. The participating plans receive these discounts, refunds, or rebates from the health care providers at or after the time the participating plans pay the health care providers for their services. Moreover, participating plans periodically receive other refunds and rebates from these health care providers when incorrect payments are cor-

**1.** These organizations are Arkansas Blue Cross and Blue Shield, Blue Cross of California, Blue Cross and Blue Shield of Colorado, Blue Cross and Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kentucky, Blue Cross and Blue Shield of Maine, Blue Cross and Blue Shield of Maryland, Inc., Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, Blue Cross & Blue Shield of Mississippi, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of New Hampshire, Blue Cross and Blue Shield of New Jersey, Inc., Blue Cross and Blue Shield of North Carolina, Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Oklahoma, Blue Cross of Northeastern Pennsylvania, Blue Cross and Blue Shield of Memphis, Blue Cross and Blue Shield of Utah, Blue Cross and Blue Shield of Virginia, Blue Cross & Blue Shield United of Wisconsin, Capital Blue Cross, Central Benefits Mutual Insurance Co., Community Mutual Insurance Co., Empire Blue Cross and Blue Shield, and Independence Blue Cross.

rected and when similar adjustments take place.

### B. *The Relators' Allegations*[2]

In brief, relators allege that the participating plans failed to credit the government with the money they received from the health care providers and that BCBSNCA failed to collect this money from the participating plans for credit to the government. These allegations appear in two counts: one relating to the Federal Employees Health Benefits Program ("FEHBP") and the second relating to contracting government agencies, namely the Board of Governors of the Federal Reserve Board and the Smithsonian Institution.

### 1. *Count One: FEHBP*

BCBSNCA contracts with certain employee organization plans ("EOPs") under the FEHBP. EOPs are one type of health plan available to federal employees who are members of those groups and the participating plans provide health care benefits to members of the EOPs. BCBSNCA acts as the control plan, or the administrator, when health benefits are provided to EOP subscribers who live within the service area of the respective participating plans.

The five EOPs at issue in this case are the National Treasury Employees Union, the National Alliance of Postal and Federal Employees, the Beneficial Association of Capital Employees, the National Association of Postmasters of the United States, and the United States Secret Service Employee Health Association. At the time relevant to relators' claims, these EOPs were administered by BCBSNCA, which underwrites and administers claims submitted by these EOPs to participating local plans nationwide.

Under the statute and regulations governing the FEHBP, BCBSNCA and the participating plans may charge the government only for the actual costs they incur in providing health benefits. "Actual costs" are defined as the costs of health benefits provided *less* applicable refunds, rebates, allowances, and credits. 48 C.F.R. § 1652.216-71(b)(2)(i). Relators contend that the participating plans failed to credit or refund to

FEHBP the provider discounts, refunds, and rebates they received for services rendered to members of the five EOPs at issue. Relators further claim that the participating plans breached their duty to pass on to BCBSNCA, for credit to the FEHBP, the discounts, refunds, and rebates the plans secured, thereby fraudulently overcharging the government. Therefore, relators aver, defendant participating plans have made false claims to the government within the meaning of 31 U.S.C. § 3729.

Relators allege that BCBSNCA has also fraudulently overcharged the government by abdicating its duty to collect discounts, refunds, and rebates from the participating plans and to credit them to the FEHBP. On the basis of this additional allegation, relators charge that defendant BCBSNCA has made false claims to the government within the meaning of 31 U.S.C. § 3729.

### 2. *Count Two: Contracting Government Agencies*

BCBSNCA has contracted with government agencies to provide health insurance benefits and the participating plans provide those benefits to employees of the government agencies. The agencies at issue are the Board of Governors of the Federal Reserve Board ("Federal Reserve") and the Smithsonian Institution. First, relators allege that BCBSNCA overcharged the government for covered benefits by failing to credit or refund to the Federal Reserve and the Smithsonian Institution applicable discounts, refunds, and rebates it received on behalf of employees of those agencies. Second, relators allege that BCBSNCA overcharged the government by failing to collect applicable discounts, refunds, and rebates from participating plans that were attributable to the named government agencies. Third, relators claim that participating plans overcharged the government by failing to credit or refund to BCBSNCA or to the agencies discounts, refunds, and rebates they received from health care providers that were attributable to employees of the named agencies. On the basis of these allegations, relators claim that defendants BCBSNCA and the participating

---

**2.** The Court notes that all of relators' allegations      against defendants are unproven.

plans made false claims to the government within the meaning of 31 U.S.C. § 3729 when they failed to pass on those discounts, refunds, and rebates attributable to employees of the Federal Reserve and the Smithsonian Institution.

## C. *Relators*

Relators in this matter are former federal government auditors. Relator Richard Gedrich began work with the Office of Personnel Management ("OPM") in April 1980 as an auditor in the Insurance Audit Division of the Office of Inspector General. The Blue Cross Blue Shield Branch of the Insurance Audit Division audits those insurance plans that have a license to use the Blue Cross and Blue Shield trademark. Gedrich was assigned primarily to the Blue Cross Blue Shield Branch until his resignation in March 1987. Relator Stephen Foust joined OPM in October 1983 as an auditor in the Insurance Audit Division of the Office of Inspector General, also assigned primarily to Blue Cross Blue Shield Branch audits. He resigned in August 1987.

Both relators joined the same audit firm after leaving OPM. In late 1986 and 1987, this audit firm was awarded two contracts by OPM to perform audits on OPM's behalf. Relators performed six Service Benefit Plan audits for OPM pursuant to these two contracts. Work orders issued under these contracts required the firm to "substantiate that amounts" charged to the government-funded plans were "net of applicable refunds, credits, and income." The firm was directed to advise OPM's representative if it suspected fraud by the plans. The Comptroller General's Standards, binding on the firm, required the auditors to report suspected fraud in writing to OPM.

On February 10, 1992, Foust rejoined the OPM Office of Inspector General as a temporary employee and OPM planned to hire Gedrich on that basis as well. The OPM Office of Inspector General audits the EOPs and its Employee Organization Branch audits the final accounting statements that BCBSNCA submits for each EOP with which it contracts. Relator Foust was assigned to this branch from February 1992 to March 1992. On March 13, 1992, Foust's employ-

ment was terminated effective March 20 because of conflict of interest concerns about his outside consulting business. Gedrich was never rehired by OPM.

In December 1992, relators submitted an unsolicited written proposal to the National Alliance of Postal and Federal Employees ("Alliance") requesting that they be hired to conduct an audit of BCBSNCA's handling of Alliance's health benefits plan. BCBSNCA Ex. E at ¶ 5. On January 21, 1993, relators met with Larry Lindsey, Alliance's Insurance Director, to discuss this proposal and represented to Lindsey that they had gained substantial experience auditing Blue Cross Blue Shield plans through their work in the government. Alliance ultimately did not retain relators.

Relators entered into a contract with the FDIC in April 1993 to audit BCBSNCA. Their contract with the FDIC precluded them from using any information in the performance of the contract for any purpose other than the performance of the contract and precluded disclosure of such information to anyone outside the FDIC. During the FDIC audit, BCBSNCA gave relators access to information about the pass-through of discounts from BCBSNCA and the participating plans to the FDIC, unions, and agency accounts.

## II. Discussion

Defendants and the United States all claim that this Court lacks subject matter jurisdiction over the relators' second amended complaint because the relators' allegations are based on similar transactions that were "publicly disclosed" before the relators filed their original complaint and because the relators are not an "original source." *See* 31 U.S.C. § 3730(e)(4)(A). In the alternative, defendants seek to have the relators' second amended complaint dismissed on the ground that it fails to state allegations of fraud with sufficient particularity. *See* Fed.R.Civ.P. 9(b).

There are several motions to dismiss the relators from this action. Defendant participating plans, defendant BCBSNCA, and defendant Empire Blue Cross (one of the par-

ticipating plans) have each filed motions to dismiss relators' second amended complaint. Defendant BCBSNCA has filed a motion to dismiss relators' first amended complaint and the United States has moved to dismiss the relators from this action. Because these motions raise similar arguments, the Court will consider them together.

### A. *Subject Matter Jurisdiction*

Defendants and the United States argue that this Court lacks subject matter jurisdiction over relators' claims because the allegations of relators' second amended complaint are based on substantially similar transactions that had been "publicly disclosed" before the relators filed their original complaint and because the relators are not an "original source" of the information on which the publicly disclosed allegations are based. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 690 (D.C.Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). The False Claims Act provides that:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The statute goes on to define "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

■ The Court's analysis must progress as follows:

> First, the reviewing court must ascertain whether the "allegations or transactions" upon which the suit is based were "public[ly] disclos[ed]" in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investiga-

tion, or from the news media." 31 U.S.C. § 3730(e)(4)(A). If—and only if—the answer to the first question is affirmative, will the court then proceed to the "original source" inquiry, under which it asks if the *qui tam* plaintiff "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B).

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 651 (D.C.Cir. 1994) (internal citation omitted).

### 1. *Public Disclosures*

The Court must first determine, then, whether there has been a "public disclosure" of the relators' allegations and whether their action is based upon those disclosures. The statute lists several possible sources for those disclosures: "a criminal, civil, or administrative hearing, ... a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or ... the news media." 31 U.S.C. § 3730(e)(4)(A). Defendants and the United States claim that public disclosures were made in civil hearings, the news media, and administrative audits and investigations.

### a. *Civil Hearings*

Movants claim that civil complaints for alleged failures to share provider discounts filed by Dana Corporation ("Dana"), General Electric ("G.E."), and AT & T against participating plans—including some defendants here—constitute public disclosures. First, after briefly summarizing the factual background, the Court must determine whether such materials could constitute public disclosures under Section 3730(e)(4)(A). Then, the Court must decide whether this qui tam action is "based upon the public disclosure of allegations or transactions" in those materials because the jurisdictional provision bars only those actions "based upon" publicly disclosed allegations or transactions.

In November 1987, Dana sued certain Blue Cross Blue Shield plans alleging that they had breached their contract by failing to pass on health care provider refunds. Complaint, *Dana Corp. v. Blue Cross and Blue Shield Mutual of Northern Ohio,* No. C87-

7734(N.D.Ohio Nov.13, 1987), BCBSNCA Ex. K. The complaint alleges that Dana entered into a contract with Blue Cross and Blue Shield Mutual of Northern Ohio to provide health benefits to Dana's employees. Blue Cross and Blue Shield Mutual of Northern Ohio served as a "control plan" and the other defendant Blue Cross Blue Shield plans acted as "participating plans" to provide health benefits outside of Ohio. Blue Cross and Blue Shield of Michigan is a defendant here and was a defendant in the Dana case. Dana's allegations were addressed in a Sixth Circuit opinion. *Dana Corp. v. Blue Cross and Blue Shield Mutual of Northern Ohio,* 900 F.2d 882, 884 (6th Cir.1988).

G.E. filed a similar complaint in June 1990 against certain Blue Cross Blue Shield plans involving the plans' administration of a nationwide health benefits plan for G.E. employees. Complaint, *General Electric Co. v. Blue Cross and Blue Shield of Mass., Inc.,* Civ. No. B90–297 (D.Conn. June 25, 1990), BCBSNCA Ex. O. These defendants included Blue Cross of California, Blue Cross and Blue Shield of Colorado, Blue Cross and Blue Shield of Georgia, Inc., Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, Community Mutual Insurance Company, Independence Blue Cross, Blue Cross and Blue Shield of Memphis, and Blue Cross and Blue Shield of Virginia, all named defendants to the instant action as well. G.E. claimed that the control plan and the participating plans did not pass through to the company discounts received from health care providers. G.E. further alleged that defendants committed fraud and breach of contract along with racketeering violations.

AT & T filed a similar complaint in March 1993 against certain Blue Cross Blue Shield plans alleging that they had breached their contracts with AT & T by failing to pass through to AT & T discounts received from health care providers. Complaint, *American Tel. & Tel. Co. v. Empire Blue Cross and Blue Shield,* Civ. No. 93–1224 (D .N.J. March 19, 1993), BCBSNCA Ex. Q. AT & T claimed that it contracted with Empire Blue Cross and Blue Shield, a defendant here, to be the control plan and that other Blue Cross Blue Shield plans were participating plans, including Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Michigan, Central Benefits Mutual Insurance Company, and Independence Blue Cross, all also named in relators' second amended complaint here. AT & T claimed that defendants committed fraud and violated racketeering laws.

▮ According to the False Claims Act, allegations or transactions may be publicly disclosed in a "civil ... hearing." The D.C. Circuit has held that "[i]t is clear from statutory context that the term 'hearing' was intended to apply in a broad context of legal proceedings under § 3730(e)(4)(A)." *Springfield Terminal Railway Co.,* 14 F.3d at 652. That opinion concluded that, for purposes of this statutory phrase, " 'hearing' is roughly synonymous with 'proceeding,' " noting that "[i]f court documents could be copied at will to provide the basis for qui tam suits, a half-century of precedent would be swiftly refuted without a flicker of recognition from Congress." *Id.* The Court finds that a civil complaint can plainly constitute a public disclosure in a civil hearing under the False Claims Act.

▮ The Court now turns to whether this qui tam action is "based upon the public disclosure of allegations or transactions" in the three lawsuits and thus covered by the jurisdictional bar. A recent D.C. Circuit case leads this Court to conclude that the action is in fact based on public disclosures from these lawsuits.

Relators in *Findley* filed their qui tam action against all employees' clubs of the Bureau of Prisons and the Department of Justice that earned revenue from providing vending machine services on federal property. *Findley,* 105 F.3d at 678. The D.C. Circuit found that the allegations and transactions in the following materials triggered the jurisdictional bar: (1) a 1952 opinion from the Comptroller General recognizing that various postal employee groups were operating vending machines for profit and deciding not to halt the practice; (2) the 1974 Senate Report on amending the Randolph–Sheppard Act recognizing that "[f]ederal employee welfare and recreation groups" derive income from vending machines on federal

property; and (3) the Federal Circuit decision in *Texas State Commission for the Blind v. United States,* 796 F.2d 400, 402–03 (Fed.Cir.1986) (en banc), reviewing the tension between the Randolph–Sheppard Act, which permits blind persons to operate vending machines in federal buildings, and the practice of allowing federal employee organizations to profit by doing the same. *Findley,* 105 F.3d at 685–86.

Notwithstanding the fact that none of these public disclosures mentioned employees groups from the Bureau of Prisons or the Department of Justice, but instead mentioned postal employees and generic federal employees' groups, the D.C. Circuit held that the disclosures barred relators' case. Each of those public disclosures raised a suspicion of fraud by recognizing the possible illegality of "permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services." *Id.* at 687. The court of appeals found:

> The disclosures recognize that the practice occurs throughout the federal government, thus their relevance cannot be confined to specific agencies. On the other hand, ... the public disclosures here specifically identify the nature of the fraud— illegal retention of monies owed to the government and unauthorized administrative approval of the practice—as well as the federal employee actors engaged in the allegedly fraudulent activity.

*Id.* Relators in *Findley* had argued that such a bar was similar to foreclosing suits by persons who identified specific instances of fraud by defense contractors where there had been congressional hearings regarding the general problem of defense contractor fraud. *Id.* at 686. The D.C. Circuit disagreed, finding that "[l]ittle similarity exists between combing through the myriad of transactions performed by the various defense contractors in search of fraud and finding easily identifiable federal employee organizations that provide vending services on federal property." *Id.* at 687.

The Court finds that here, as in *Findley,* relators' complaint "reveals allegations which substantially repeat what the public already knows and add only the identity of particular [organizations] engaged in the ... previously documented generic practice." *Id.* Relators' complaint alleges that BCBSNCA, the control plan, contracted with OPM to provide health care benefits to certain EOPs and government agencies. The complaint also alleges that BCBSNCA contracted with participating Blue Cross and Blue Shield plans to provide benefits. Finally, it claims that BCBSNCA and the participating plans submitted claims for payment to the government that did not reflect the actual cost of health care services provided to government employees. Several of the Blue Cross Blue Shield plans named in those civil complaints are defendant participating plans in the instant action.

The Dana complaint alleges that the control plan—there, Blue Cross and Blue Shield Mutual of Northern Ohio ("BCBSMNO")— contracted with Dana to provide health care benefits to Dana employees, agreeing to do so at cost plus an administrative surcharge. The complaint further alleges that BCBSMNO contracted with participating Blue Cross Blue Shield plans that contracted with health care providers. Lastly, the plaintiff in that case claims that BCBSMNO and the participating plans retained all or substantially all of the rebates or partial refunds given by health care providers rather than crediting those amounts to Dana. The G.E. complaint and the AT & T complaint contain similar allegations with respect to different defendants.

Each of these civil complaints recognized the illegality of failing to pass through to an entity contracting for health care services rebates or refunds given to Blue Cross and Blue Shield plans by health care providers. The disclosures, as in *Findley,* "specifically identify the nature of the fraud ... as well as the ... actors engaged in the allegedly fraudulent activity." *See id.* As such, the disclosures render it easy to identify those federal employee organizations—here, the EOPs and the government agencies—that contracted with several of the same Blue Cross and Blue Shield defendants named in relators' complaint, enabling the government to investigate the matter and decide whether

to prosecute. In fact, the government was investigating these same allegations at the time relators filed their original complaint in November 1993. Relators' complaint adds only the identity of particular government organizations allegedly harmed by the practice of failing to credit discounts from health care providers as well as the identity of some alleged perpetrators of the fraud. The Court finds that this action is based upon "allegations or transactions" that have been publicly disclosed in a "civil ... hearing." *See* 31 U.S.C. § 3730(e)(4)(A).

### b. *News Media*

Movants claim that additional public disclosures took place when various articles were published describing the Dana, G.E., and AT & T lawsuits. The Court finds that these are also public disclosures of the allegations and transactions upon which relators' second amended complaint was based.

■ These press reports publicize the basic allegations made in the three lawsuits. *See* BCBSNCA Exs. F, G, & H. However, they also suggest that the alleged fraudulent activity is even more widespread. One report begins, "Some of the largest employers in the United States accuse Blue Cross and Blue Shield plans around the nation of failing to pass along price discounts that the Blues get on hospital bills." Greg B. Smith, "Blues Accused of Price Inflation," *Pittsburgh Post–Gazette*, May 30, 1993, at A7. The article goes on to state that, in addition to the AT & T, G.E., and Dana lawsuits, K–Mart, General Motors, IBM, and NYNEX have settled with Blue Cross Blue Shield entities or are "weighing their options" regarding similar claims. *Id.* The report quotes a consultant as saying, "It's a problem that the Blue Cross plans have systematically.... It happens a lot on national account business and not just among a few plans—it's among several." *Id.* Another article declares that "AT & T's suit charges that the alleged overbilling was part of a pattern of fraudulent activity by the Blues plans that has also hit other employers, including K-mart Corp. of Troy, Mich., and Dana Corp., an automotive components manufacturer, in Toledo, Ohio." Douglas McLeod, "AT & T to Audit Books of Blues Plans It Says Overbilled for a Decade," *Business Insurance*, May 10, 1993, at 1.

Because the disclosures "recognize that the practice occurs throughout [the industry], ... their relevance cannot be confined to specific [Blue Cross Blue Shield plans]." *See Findley*, 105 F.3d at 687. These articles enable the government to investigate the practices of Blue Cross Blue Shield plans that contract with government entities and decide itself whether to prosecute those plans for fraud. Therefore, relators' action is based on "allegations or transactions" that have been publicly disclosed in the news media. *See* 31 U.S.C. § 3730(e)(4)(A).

### c. *Administrative Audit or Investigation*

■ In addition to the above disclosures, movants allege that further public disclosures of the allegations at issue were made in an administrative audit or investigation. They claim that the OPM Office of the Inspector General conducted an administrative audit of BCBSNCA and the participating plans concerning their handling of provider discounts for the same federal organizations named by relators and that disclosures during the course of that audit constitute public disclosures within the False Claims Act. The Court finds that public disclosures occurred in the administrative audit concerning the allegations described by relators in their complaint, thus raising the jurisdictional bar.

First, the government has shown that OPM disclosed to nine participating plans that are not defendants in this action that it was investigating whether participating plans were crediting hospital refunds and end-of-year settlements to EOPs. Second, the government has demonstrated that BCBSNCA revealed to the EOPs at issue in this case as well as to participating plans not named in relators' complaint the subject of OPM's audit. Third, the government has shown that the general counsel of one of the EOPs at issue in this case was informed by OPM that the Office of Inspector General at OPM was investigating whether BCBSNCA and the participating plans were passing through the discounts to FEHBA plans sponsored by EOPs and federal agencies.

Preliminarily, relators argue that OPM's inquiry regarding BCBSNCA and the partic-

ipating plans does not constitute "public disclosure of allegations or transactions in . . . [an] administrative . . . audit" under the False Claims Act. *See* 31 U.S.C. § 3730(e)(4)(A). They claim that there was no "audit" because the government was conducting an "audit inquiry" rather than an audit and because there was no final or draft audit report. The Court disagrees. The fact that no final or draft report had been completed or the fact that the government issued an "audit inquiry," a formal notice sent pursuant to an existing audit, does not establish that there was no actual audit underway. An audit is "a formal or official examination and verification of books of account." Webster's Third New International Dictionary 143 (1993). It is clear from the government's declarations and exhibits that OPM was in fact undertaking *an audit* of certain underwriting activities by BCBSNCA and the participating plans. The Court concludes that the procedure undertaken by OPM to look into defendants' handling of provider discounts constituted an administrative audit.

i. Disclosures by OPM and BCBSNCA to Participating Plans That are Not Defendants in this Action and to EOPs

A. *Facts*

On September 20, 1991, the Insurance Audit Division of the OPM Office of the Inspector General informed BCBSNCA that it intended to conduct an administrative audit of BCBSNCA with respect to its union customers. On March 2, 1992, the OPM Office of the Inspector General sent out surveys to Blue Cross Blue Shield participating plans around the country notifying them that it was auditing the five EOPs at issue here. These surveys made clear that OPM was investigating whether participating plans were crediting refunds from health care providers to BCBSNCA and crediting end-of-year settlements to the EOPs. Sent to several participating plans, including nine plans

that are not defendants in this lawsuit,[3] the survey requested that each participating plan advise whether it was passing through health care provider discounts to BCBSNCA.

The OPM surveys stated, "The Office of Personnel Management is currently auditing Health Benefit Charges for the following groups: BACE, NAPFE, NAPUS, NTEU, and SEC. SERV."[4] Affidavit of Charles E. Gibbons at Ex. 1, p. 1. They direct the participating plans to "complete the following survey pertaining to health benefit charges reimbursed to your Plan by [BCBSNCA] on behalf of the FEHBP." *Id.* The surveys asked the following questions:

1. Has your Plan negotiated payment agreements with Hospitals in your service area which result in a provider differential[?]

2. Do your claims for reimbursement through the IPDR system equal your payment to hospitals[?]

3. If you answered NO to Question 2., provide an explanation.

4. Has your Plan had any retroactive settlement with hospitals during the scope of our audit[?]

5. If you answered YES to Question 4., provide an explanation how retroactive settlements are adjusted using the IPDR system.

*Id.* at pp. 1–2.

OPM completed the on-site portion of its audit in May 1992. After this portion of the audit ended on May 12, 1992, the federal auditors held a conference with BCBSNCA to discuss the audit's status. At that conference, the OPM auditors notified BCBSNCA that they intended to pursue the question of whether BCBSNCA and the participating plans shared their health care provider discounts with the EOPs. Six participating plans were then chosen for more searching review

---

3. Blue Cross Blue Shield of Arizona, Blue Cross of Idaho Health Service, Inc., Blue Cross Blue Shield of Indiana, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Montana, Blue Cross Blue Shield of Oregon, Blue Cross Blue Shield of South Carolina, and Blue Cross Blue Shield of Texas.

4. These are the five EOPs at issue in this case: the Beneficial Association of Capital Employees, the National Alliance of Postal and Federal Employees, the National Association of Postmasters of the United States, the National Treasury Employees Union, and the United States Secret Service Employee Health Association.

of the "provider differential" issue. On October 23, 1992, the OPM Inspector General issued Informal Audit Inquiry Number B–18 to BCBSNCA. *See* Gibbons Decl. at Ex. 4. The Audit Inquiry questioned $1,049,208 in provider discounts in connection with the six participating plans chosen for review.

BCBSNCA then conducted its own survey of the participating plans. On March 2, 1993, BCBSNCA sent a memo to all participating plans that were involved with BCBSNCA in providing health benefits to members of the EOPs at issue in this case. The recipients included several plans not named as defendants in this lawsuit. The memo described OPM's area of audit inquiry, reporting that OPM had questioned whether discounts are being passed through. Casarella Decl. at Ex. 1. In addition, the memo asked each plan to state whether it "is passing through all hospital discounts and differentials" for those EOPs. *Id.*

Through a letter dated June 25, 1993, BCBSNCA notified its EOP customers (the five EOPs involved in this case) and the Office of the Inspector General of the initial results of its survey of participating plans. That letter disclosed that "not all Participating Plans have passed through their discounts." Israel Decl. at Ex. 2. On July 14, 1993, the Chief of the Health Benefits Contracts Division of the Office of Insurance Programs of OPM wrote to BCBSNCA regarding the pending OPM audit. The letter requested that BCBSNCA

> audit the records of all Participating Plans who have agreed to pass through provider discounts to determine the credits due each of the underwritten FEHBP Plans as a result of health benefit charges in excess of the amounts actually paid to providers. Please identify the Participating Plans that did not agree to pass through provider discounts.

Gibbons Decl. at Ex. 7. The letter also asked "that BCBSNCA audit all Participating Plans to determine the credits due the underwritten FEHBP Plans as a result of hospital settlements, uncashed checks, and returned checks." *Id.* On July 15, 1993, BCBSNCA advised its EOP customers and the Office of the Inspector General that its

survey disclosed that all of the plans that had not initially responded to the survey were passing through either full or partial discounts.

BSBSNCA sent a letter to OPM on September 14, 1993, requesting a meeting to discuss OPM's audit inquiry. *Id.* OPM continued to work on its draft audit report regarding the provider discounts. Before that report could be completed, relators filed the instant action in November of 1993.

### B. *Analysis*

The communications by OPM and BCBSNCA to the participating plans and the EOPs revealed the transactions and allegations that relators' complaint is based upon to strangers to the fraud, namely the participating plans that are not named as defendants in this action and the EOPs. These communications put the participating plans on notice that OPM was investigating whether the participating plans were charging the EOPs and contracting government agencies more than they were actually paying for hospital services, because of discounts, rebates, or settlements negotiated with the hospitals. Nine plans who were strangers to the fraud were put on notice by OPM in March 1992, twenty months before this suit was filed, that OPM was conducting an administrative audit concerning the allegations being pursued by relators. Several plans who were strangers to the fraud were similarly put on notice by BCBSNCA in March 1993, eight months before this suit was filed. The EOPs were also notified by BCBSNCA in June 1993 of OPM's inquiry.

Relators claim that distribution of information to contractors' employees to enable a company to respond to the government's inquiries does not constitute a public disclosure. The Second Circuit has held that a public disclosure occurs whenever the fruits of a government investigation are revealed to anyone outside the government who did not have prior knowledge of the allegations, including "innocent employees" who are themselves "strangers to the fraud." *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 322 (2d Cir.1992). The Second Circuit notes that when the employees learned of the fraud, "they were under no

obligation to keep this information confidential." *Id.* at 323. "Once allegations of fraud are revealed to members of the public with no prior knowledge thereof, the government can no longer throw a cloak of secrecy around the allegations; they are irretrievably released into the public domain." *Id.* Requiring widespread dissemination of the allegations before they can be deemed publicly disclosed "would cut against the essential purpose of the 1986 amendments, viz, that individuals with knowledge of the fraud report such information at the earliest possible time." *Id.* (internal quotation omitted). The Tenth Circuit has similarly held that "public disclosure occurs when the allegations of fraud or fraudulent transactions upon which the qui tam suit is based are affirmatively disclosed to members of the public who are otherwise strangers to the fraud." *United States ex rel. Fine v. Advanced Sciences,* 99 F.3d 1000, 1005 (10th Cir.1996).

It is true that the Ninth Circuit has concluded that a disclosure of audit reports to employees who were not involved in any alleged fraud but whose company was under investigation was *not* a disclosure to the public. *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512 (9th Cir.1995), *vacated and remanded,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). That circuit determined that those employees would have "a strong economic incentive to protect the information from outsiders" and therefore "revelation of information to an employee does not trigger the potential for corrective action presented by other forms of disclosure." *Id.* at 1518. Even if *Schumer* remains valid precedent after being vacated on other grounds by the Supreme Court, the Court finds that it is not persuasive.

In the instant case, there is no suggestion that the participating plans not named in this action who were put on notice of the possible fraud had engaged in any wrongdoing. Therefore, there is no indication that employees of those plans would have any incentive not to reveal OPM's areas of inquiry. Disclosures were made to companies that were strangers to the fraud, not companies that were accused of fraud. In addition, disclosures were made by BCBSNCA to the EOPs, entities that are also not alleged to have participated in any fraud.

The Court finds from disclosures to the participating plans and the EOPs that relators' complaint "merely echoes publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute." *Findley,* 105 F.3d at 683. Therefore, the jurisdictional bar applies.

ii. Disclosures to the General Counsel of the National Alliance of Postal and Federal Employees

A. *Facts*

The National Alliance of Postal and Federal Employees ("Alliance"), one of the EOPs at issue in this case, was concerned that discounts obtained by BCBSNCA and the participating plans were not being passed through to Alliance. In late 1992, Alliance's general counsel, George C. Lacy, decided that Alliance should prepare to litigate against BCBSNCA to obtain all of its provider discounts from BCBSNCA. Lacy met with representatives of OPM in late 1992 and told them of Alliance's suspicion that BCBSNCA and the participating plans were not passing through provider discounts. At that meeting, OPM representatives informed Lacy that the OPM Office of the Inspector General was investigating whether BCBSNCA and the participating plans were passing through provider discounts to FEHBA plans sponsored by federal employee organizations and federal agencies, including Alliance's plan.

On February 5, 1993, Lacy and Dennison Doyle, an Alliance consultant, met with Philip Neal, outside counsel for BCBSNCA. Neal informed Lacy and Doyle that not all provider discounts that had been obtained by BCBSNCA and the participating plans had been passed through to Alliance. On February 9, 1993, Lacy proposed a settlement offer to Neal, who acknowledged by letter to Lacy that auditors from the Office of the Inspector General had raised the issue of the pass-through of discounts to Alliance and the other EOPs. Then, on July 7, 1993, BCBSNCA wrote to OPM that it agreed that it owed $171,478 in connection with the Alliance plan

for unrefunded discounts. Gibbons Decl. at Ex. 7. The letter added, "Staff will be determining whether any such credits or charges are due to its other FEHBP plans in the very near future...." *Id.* The letter was copied to attorneys from the Alliance plan. *Id.*

### C. Analysis

The Court finds that the government, through OPM, disclosed to Alliance the allegations and transactions upon which relators' second amended complaint is based. When OPM informed Alliance's general counsel that it was investigating whether BCBSNCA and the participating plans were passing through provider discounts to health benefits plans sponsored by federal employee organizations and federal agencies, the government made a public disclosure to Alliance of the very allegations being made by relators. Again, relator's second amended complaint imitates publicly disclosed allegations and transactions that already allow the government to investigate the matter and choose whether to prosecute the fraud. *See Findley,* 105 F.3d at 683.

### 1. Original Source

■ Having found that relators' suit is based on publicly disclosed information, the Court must now turn to the question of whether relators are original sources of that information. Relators can maintain this action only if they qualify as original sources. Under the statute, an original source is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). The Court concludes that relators are not original sources and thus lacks subject matter jurisdiction to hear relators' claims.[5]

The statute provides that a relator who seeks to avoid the jurisdictional bar must show that he "has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). Rela-

tors Foust and Gedrich obtained the information that they claim reveals violations of the False Claims Act in the course of their duties as federal government auditors. Because relators were salaried government employees compelled to uncover and disclose fraud under the terms of their employment, they did not *voluntarily* provide the information at issue to the government. *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 743 (9th Cir.1995) (en banc), *cert. denied,* 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). They were "under an employment-related obligation to do the very acts [they] claim[ ] were voluntary," *id.* at 744, namely, detect fraudulent activity and disclose it to the government. *See Wercinski v. IBM Corp.,* 982 F.Supp. 449, 461–62 (S.D.Tex.1997); *United States ex rel. Burns v. A.D. Roe Co.,* 919 F.Supp. 255, 258 (D.Ky. 1996).

As auditors in the Office of the Inspector General, relators were "salaried government employee[s], compelled to disclose fraud by the very terms of [their] employment. [They] no more voluntarily provided information to the government than ... federal judges ... voluntarily hear arguments and draft dispositions." *Fine,* 72 F.3d at 743–44. In return for their reports of fraud to the government, relators received valuable consideration—*i.e.,* their salaries—and therefore their reports are not voluntary. *United States ex rel. Pentagen v. Caci Int'l, Inc.,* 1997 WL 473549 *8, 1997 U.S.Dist. LEXIS 12244, *21 (S.D.N.Y. Aug. 18, 1997). Any other finding would lead to extremely harmful incentives. The government pays an auditor with a salary and benefits and

> has no further need to rouse him from slumber and embolden him to perform his job responsibilities through the possibility of an enormous monetary recovery from a qui tam action. His performance of his job responsibilities, including the provision to his supervisors of the information that later formed the basis of [his qui tam suit cannot be said to be] voluntary within the meaning of the False Claims Act.

---

5. In light of the Court's finding that it lacks subject matter jurisdiction over relators' claims, it will not reach defendants' arguments that rela-

tors failed to plead their allegations of fraud with sufficient particularity pursuant to Federal Rule of Civil Procedure 9(b).

*Fine,* 72 F.3d at 745. Government auditors might "spend work time looking for personally remunerative cases ... rather than doing their assigned work; ... conceal information about fraud from superiors and government prosecutors so that they can capitalize on it for personal gain; ... and ... use the substantial powers of the federal government conferred upon public investigators ... to advance their personal financial interests." *Id.* (quoting Amicus Brief of the United States in *Fine* at 745).

■ When relators were acting as government contractors, their contracts similarly required them to report suspected fraud in writing to OPM. The Court finds that they did not voluntarily provide information to the government within the meaning of the statute when they were reporting fraud in their capacities as government contractors because they were still "compelled to disclose fraud by the very terms" of their employment. *Fine,* 72 F.3d at 743.

■ Relators protest that a finding that they are not original sources amounts to an improper finding that no government employees may ever bring qui tam actions. The Court does not so hold. Rather, the Court has determined that would-be relators who base their allegations on information they obtained in the course of their employment as investigators of fraud and who are compelled by the terms of that employment to disclose fraud to the government cannot be original sources under the False Claims Act. It is for this reason alone that the Court finds that relators are not original sources and it lacks subject matter jurisdiction to hear relators' complaint.

### III.  Conclusion

For the reasons given above, the Court finds that it does not possess subject matter jurisdiction over relators' allegations and will therefore dismiss them from this action. An appropriate Order will follow.