**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN C. PRATHER, on behalf of himself and the United States of America, and the several states of California, Delaware, Florida, Illinois, Indiana, Massachusetts, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, as well as the District of Columbia,<br>   *Plaintiff-Appellant*,<br><br>v.<br><br>AT&T, INC.; CELLCO PARTNERSHIP, dba Verizon Communications; QWEST COMMUNICATIONS INTERNATIONAL, INC.; SPRINT NEXTEL CORP.,<br>   *Defendants-Appellees*. | No. 13-17489<br><br>D.C. No. 3:09-cv-02457-CRB<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted September 14, 2016
San Francisco, California

Filed February 6, 2017

Before:  Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and William K. Sessions III,[*] District Judge.

Opinion by Judge Sessions

## SUMMARY[**]

### False Claims Act

The panel affirmed the district court's dismissal for lack
of subject matter jurisdiction of a *qui tam* action, under the
False Claims Act, brought by a longtime prosecutor, alleging
that the largest telecommunications companies in the United
States were fraudulently overcharging the federal government
for surveillance services.

The public disclosure bar of the False Claims Act
provides that once allegations of fraud have entered the
public domain, a person may not bring a *quit tam* action
unless he can prove that he was on original source of those
allegations.

The panel held that the district court properly determined
that the 2010 Amendments to the False Claims Act, which
transformed the public disclosure bar from a jurisdictional bar
to an affirmative defense, did not apply to the plaintiff's

---

[*] The Honorable William K. Sessions III, United States District Judge
for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

action, brought in 2009, because the Amendments impacted the substantive rights of parties and substantive changes are not applied retroactively.

The panel held that plaintiff was not an "original source" of the information. The panel agreed with the district court's conclusion that plaintiff did not have direct knowledge of fraud sufficient to qualify as an "original source." The panel also held that plaintiff's submissions to the Federal Communications Commission were not "voluntarily provided" as required by the statute, 31 U.S.C. § 3730(e)(4)(B).

The panel held that the district court properly concluded it had no discretion to exercise supplemental jurisdiction over plaintiff's state law claims.

---

## COUNSEL

John G. Balestriere (argued) and Jillian L. McNeil, Balestriere Fariello, New York, New York, for Plaintiff-Appellant.

Mark E. Haddad (argued), Collin Wedel (argued), and Douglas A. Axel, Sidley Austin LLP, Los Angeles, California, for Defendant-Appellee AT&T.

Laura K. Lin, Jonathan H. Blavin, and Jerome C. Roth, Munger Tolles & Olson LLP, San Francisco, California, for Defendant-Appellee Cellco Partnership.

Breena M. Roos, Kathleen M. Sullivan, and David F. Taylor, Perkins Coie LLP, Seattle, Washington, for Defendants-

Appellees Sprint Nextel Corp. and Qwest Communications International Inc.

Benjamin M. Stoll and Edward C. Barnidge, Williams & Connolly LLP, Washington, D.C., for Defendant-Appellee Sprint Nextel Corp.

## OPINION

SESSIONS, District Judge:

## OVERVIEW

John C. Prather, a longtime state prosecutor, brought a *qui tam* action alleging that the largest telecommunications ("telecom") companies in the United States were fraudulently overcharging the federal government for surveillance services. The district court dismissed Prather's action under the False Claims Act's ("FCA") public disclosure bar, which states that once allegations of fraud have entered the public domain a person may not bring a *qui tam* action unless he can prove that he was an original source of those allegations. *See* 31 U.S.C. § 3730(e)(4) (2006). For the reasons set forth below, we agree that Prather did not qualify as an original source and affirm.

## FACTUAL BACKGROUND

Prather served as an attorney in state government for over thirty years. He began his service as an Assistant Attorney General in his native state of North Carolina, then moved to New York and joined the office of the Manhattan District Attorney. In 1989 he became the Deputy Chief of the Frauds

Bureau in that office, and in 1992 was appointed Senior Investigative Counsel in the Rackets Bureau.  He joined the New York Office of the Attorney General ("NYOAG") in 1999.  From 2002 to 2008, Prather served as the Deputy Attorney General in charge of the NYOAG's Organized Crime Task Force ("OCTF").  When he initiated this *qui tam* action, he was serving as the Deputy Inspector General for Investigation in the Metropolitan Transportation Authority, Office of the Inspector General.

During his many years as a government attorney, Prather supervised hundreds of wiretaps.  The OCTF alone conducted over 200 wiretaps per year.  As head of the OCTF, Prather was authorized to determine when it was necessary to seek court permission to use wiretaps, and to personally apply for eavesdropping warrants.   He also reviewed telecom companies' rate sheets and developed surveillance budgets.

Until the mid-1990s, most wiretaps required the manual "bugging" of a phone or phone line.  To bug a phone line, law enforcement would either physically attach a device to the phone wire or place a bug inside the phone itself.  The phone company would then set up a separate line into which law enforcement could dial and listen to the conversations taking place over the bugged line.  The separate line was essentially the same as any other business or residential phone line provided by the phone company.

With the emergence of cellular phones, this method of bugging telephones was no longer effective.  In 1994, Congress passed the Communications Assistance to Law Enforcement Agencies Act ("CALEA"), authorizing the payment of $500 million to telecom companies for investment in the hardware and software necessary to

maintain law enforcement's ability to effectively eavesdrop despite technological developments in telecommunications. *See* 47 U.S.C. § 1001–1010. Prather alleges that as a result of these upgrades, phone companies can now, "by a simple flick of a switch," duplicate and forward to law enforcement both a call's audio content and its associated information, such as caller identification. ER 188.

By law, the government is required to pay the telecom companies for their assistance with eavesdropping procedures. The Omnibus Crime Control and Safe Streets Act of 1968 ("OCCSSA"), as amended, requires phone carriers to "furnish the applicant [requesting eavesdropping] forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such provider . . . is according the person whose communications are to be intercepted." 18 U.S.C. § 2518(4). In turn, law enforcement must compensate carriers for the "reasonable expenses incurred in providing such facilities or assistance." *Id.*

The OCCSSA does not define "reasonable expenses." Nor does the more-recently enacted CALEA reference the reimbursement provision in the OCCSSA. In 2002, the Federal Communications Commission ("FCC") issued an Order and Final Rule stating that "carriers can recover at least a portion of their CALEA software and hardware costs by charging to [law enforcement agencies], for each electronic surveillance order authorized by the CALEA, a fee that includes recovery of capital costs, as well as recovery of the specific costs associated with each order." *In re Commc'ns Assistance for Law Enforcement Act*, 17 FCC Rcd. 6896, 6917 ¶ 60 (2002).

Prather claims that the telecom companies have used CALEA to overcharge law enforcement agencies for wiretaps and related surveillance assistance. He asserts that although the work involved in providing a wiretap has decreased since the technological changes funded by CALEA, charges for such services have generally increased tenfold since the law was passed. Prather allegedly witnessed these price increases himself through his work as a prosecutor, and as a result of information he obtained from telecom company representatives.

Prather claims that he spoke with his superiors at the NYOAG about the suspected overcharges as early as 1999. He reportedly raised similar concerns with the Manhattan District Attorney's Office. There is no allegation that he spoke to or otherwise alerted the federal government prior to 2004, when the FCC requested input from law enforcement agencies about their wiretap costs. The FCC inquiry was spurred by a joint petition submitted by the DOJ, FBI, and DEA seeking a review of those costs. Among the issues identified by the petition was the need to "clarify the cost methodology and financial responsibility associated with intercept provisioning." ER 232, 299–302. The petition also asked the FCC to reverse its 2002 Order allowing carriers to recover CALEA-related costs, including capital investments, through intercept charges.

The FCC issued a formal request for comment on the joint petition on March 12, 2004. New York Attorney General Elliot Spitzer was among those who submitted comments. Prather contends he had to convince the person who was preparing the NYOAG's comments, Susanna Zwerling, to include allegations of overcharging. Zwerling eventually requested that Prather submit affidavits as part of the

NYOAG's official submission, the first of which was dated April 12, 2004, and received by the FCC on April 14, 2004. ER 24–32, 33–42; SER 49, 85–87, 137–72. While the affidavits were generated during Prather's work hours, on his work computer, and submitted in his official capacity, SER 86–88, 90–91, Prather submits that nothing in his role as the head of the OCTF compelled him to raise the issue of overcharging with either the New York Attorney General or the FCC.

Other law enforcement agencies also offered comments in response to the FCC's request. Some of those comments were submitted before those of the NYOAG. SER 110–19. Several comments expressed concerns about excessive charges. *Id.* On April 27, 2004, the DOJ, FBI, and DEA replied with their own concerns about intercept fees. On August 9, 2004, the FCC issued a second request for comments. In response, the NYOAG and Prather reiterated their concerns.

Appellees submit that while Prather alleges overcharges, his claims are speculative. In his work as a prosecutor, Prather received rate sheets from telecom companies listing pricing for surveillance-related services. Those rate sheets did not include information about the companies' internal costs, and Prather conceded in his deposition that he did not know what a carrier's actual costs were for wiretapping. SER 76–77 (Q: "You don't know what, in fact, [the] carriers' actual costs that they do incur on wiretap provisional services are; correct? A: I don't."). Appellees also submit that Prather viewed only one invoice—a $200 charge for a long-distance intercept—from a pre-CALEA wiretap. After CALEA, he reportedly viewed, at most, five other invoices,

but does not recall the dates, carriers, amounts, or services involved.  SER 67–68.

On May 12, 2006, the FCC issued an order stating that

> its prior statement regarding the ability of carriers to recover a portion of their CALEA capital costs through electronic surveillance order charges imposed on [government agencies] . . . was made without the benefit of a complete and full record on the issue. . . . We [now] conclude that, while carriers possess the authority to recover through intercept charges the costs associated with carrying out an intercept that is accomplished using a CALEA-based intercept solution, they are prohibited by CALEA from recovering through intercept charges the costs of making modifications to equipment, facilities, or services . . . [or] the costs of developing, installing, and deploying CALEA-based intercept solutions . . . .

SER 207–08; *In re Commc'ns Assistance for Law Enforcement Act & Broadband Access & Servs.*, 21 FCC Rcd. 5360, 5392–93 ¶ 71 (2006) (footnotes omitted).  Prather alleges that despite the FCC's updated position with respect to recoverable costs, telecom companies have continued to overcharge.

## PROCEDURAL HISTORY

Prather filed his initial complaint on June 3, 2009. The complaint was unsealed on July 11, 2011, the same day the United States submitted notice of its election not to intervene.

Appellee telecom companies filed a joint motion to dismiss. Dist. Dkt. 63. The district court granted the motion to dismiss with leave to amend, and allowed limited discovery on Prather's status as an original source of his fraud allegations.

Prather filed an amended complaint on July 18, 2012. After he was deposed, Appellees filed a joint motion to dismiss the amended complaint. The district court granted the motion to dismiss on November 5, 2013, concluding that it lacked jurisdiction because (1) the 2010 Amendments to the FCA did not apply to Prather's action; (2) Prather did not have direct knowledge of the alleged fraud; (3) his disclosures were not voluntary in light of his duties as a state prosecutor; and (4) he did not have a hand in commencing an investigation. The district court also dismissed Prather's state law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367(c). Prather appealed.

## STANDARD OF REVIEW

We review a dismissal for lack of subject matter jurisdiction *de novo*. *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir. 2002); *Ma v. Reno*, 114 F.3d 128, 130 (9th Cir. 1997). We must accept the district court's factual findings relevant to subject matter jurisdiction unless those findings were clearly erroneous. *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000).

## DISCUSSION

### I. Application of the 2010 Amendments to the False Claims Act

Prather brought his claims under the FCA in 2009. On March 23, 2010, the Patient Protection and Affordable Care Act amended the public disclosure bar of the FCA. Prior to 2010, the FCA stated:

> No court shall have jurisdiction over an [FCA *qui tam*] action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). In 2010, amendments to the FCA removed the reference to jurisdiction and adopted the following language:

> The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010 Amendments). Courts have held that these amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense. *See, e.g.*, *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016) ("Post-amendment, the public-disclosure bar is a grounds for dismissal—effectively, an affirmative defense—rather than a jurisdictional bar."); *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) ("We conclude that the amended § 3730(e)(4) creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction."); *see also Rockwell Int'l Corp v. United States*, 549 U.S. 457, 468 (2007) ("[T]he jurisdictional nature of the original-source requirement [prior to the 2010 Amendments] is clear *ex visceribus verborum*.").

Prather submits that the changes to the public disclosure bar were jurisdictional rather than substantive, and that the usual presumption against statutory retroactivity does not apply to jurisdictional changes. Accordingly, he contends that the district court should have applied the amended statute retroactively and placed the burden on Defendants to assert public disclosure as an affirmative defense.

The Supreme Court has determined that the amendments to 31 U.S.C. § 3730(e)(4) are not retroactive. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit."). In so holding, the Supreme Court did not differentiate between substantive and jurisdictional provisions. In *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997), however, the Court discussed jurisdictional amendments, contrasting those that "affect only *where* a suit may be brought" with amendments that impact "*whether* it may be brought at all." *Id.* at 951 (emphasis in original). An amendment that "*creates* jurisdiction where none previously existed . . . speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Id.* (emphasis in original).

Like the 1986 amendments to the FCA's public disclosure bar discussed in *Hughes Aircraft*, the 2010 Amendments said nothing about where a suit must be brought, and instead addressed the power of a district court to assert jurisdiction. Specifically, prior to the 2010 Amendments, a district court lacked jurisdiction to hear a case that was barred by the public disclosure provision. After the 2010 Amendments, a court could assert jurisdiction over the relator's complaint and entertain public disclosure as a defense. Under the *Hughes Aircraft* analysis, the 2010 Amendments impact the substantive rights of parties. As substantive changes are not applied retroactively, the district court properly determined that the 2010 Amendments do not apply.

## II. Whether Prather is an "Original Source"

The FCA imposes civil penalties on any person who defrauds the federal government. 31 U.S.C. § 3729(a) (2006). The statute provides that, in addition to enforcement actions brought by the Attorney General, a private person may bring a *qui tam* action on behalf of the government and himself as the "relator." *Id.* § 3730. "If the relator prevails, he receives a percentage of the recovery, with the remainder being paid to the government." *United States ex. rel. Biddle v. Bd. of Trs. of Leland Stanford, Jr. Univ.*, 161 F.3d 533, 535 (9th Cir. 1998).

As discussed above, a relator's action brought under the pre-2010 FCA is jurisdictionally barred if it is "based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). Prather concedes that his claims were publicized before he filed suit, and that the public disclosure bar may therefore apply. He can avoid application of the bar, however, if he qualifies as an "original source" of the disclosed information. *See id.*

There is no dispute that the pre-2010 definition of an "original source" applies to Prather's claims. The 2010 Amendments substantively changed the "original source" definition, and the new language does not apply retroactively to actions brought prior to the amendment, *see United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1123 n.1 (9th Cir. 2015) (en banc). Prior to 2010, the statute defined an "original source" as "an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before filing an

action . . . based on the information." *Id.* at 1128 (quoting version of 31 U.S.C. § 3730(e)(4)(B) in effect prior to 2010).[1] Prather fails to satisfy either of those requirements.

## A.  Direct and Independent Knowledge of Fraud

To have direct knowledge under the statute, a person's knowledge must be firsthand, obtained through his own labor, and unmediated by anything else. *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1202 (9th Cir. 2009), *overruled on other grounds by Hartpence*, 792 F.3d at 1128 n.6.  The person must also have "true 'knowledge,'" as opposed to guesswork or suspicion, since "the purposes of the Act would not be served by allowing a relator to maintain a qui tam suit based on pure speculation or conjecture." *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525–26 (9th Cir. 1999); *Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th Cir. 2014) (concluding that "generalized suspicion" did not constitute "knowledge" of a kickback scheme).

Prather contends that he had firsthand knowledge of fraud based upon his review of invoices sent to the OCTF, his knowledge of average post-CALEA wiretap charges, and his experience setting investigation budgets.  He claims to have learned about wiretapping technologies, both pre- and post-CALEA, in conversations with OCTF technology personnel

---

[1] The district court, following the law of this Circuit at the time, cited a third "original source" requirement: that the relator "had a hand in the public disclosure of allegations that are part of . . . [the] suit." *United States ex rel. Prather v. AT&T, Inc.*, 996 F. Supp. 2d 861, 867 (N.D. Cal. 2013).  This Circuit has since found that this third requirement "has no textual basis," and has thus given "it a respectful burial." *Hartpence*, 792 F.3d at 1127–28.

about the OCTF's own systems, and through participation in CALEA-related conferences. In concluding that the telecom companies were overcharging, Prather compared the post-CALEA charges to an invoice he saw for a 1988 landline wiretap. ASER 53–54. Prather also recalls speaking with a Sprint representative prior to May 2000, who allegedly stated that "some" of Sprint's charges were for "fees from transaction attorneys who reviewed court rulings on wiretaps." ER 196; SER 80–81.

The district court disagreed, comparing Prather's case to *Aflatooni*, in which a doctor claimed that defendants were committing Medicare fraud by making medically unnecessary referrals. 163 F.3d at 525. On appeal, this Court affirmed the district court's conclusion that Dr. Aflatooni's evidence did not constitute "knowledge" under the FCA. We noted that "Dr. Aflatooni could not recall the name of any [M]edicare patient who was allegedly charged for unnecessary medical services," and that his evidence against the subcontractor suggested only that it "was negligent in the handling of some of its Medicare claims." *Id*. at 526. Further, "Dr. Aflatooni [did] not point to any other evidence in the record which suggest[ed] that he ha[d] 'information,' as opposed to speculation," to support his claim of Medicare fraud. *Id*.

Prather contends that, unlike Dr. Aflatooni, he gathered information over a period of years and was not merely guessing when he filed his action. His fundamental premise is that government-funded technological upgrades under CALEA necessarily resulted in a reduction of the labor required to provide discrete wiretap and surveillance services. He contends that despite doing less work—and so presumably incurring lower costs—the telecom companies have been charging law enforcement agencies several times more than

the cost of pre-CALEA wiretaps.  He argues he "connect[ed] the dots" to conclude that OCTF and other law enforcement agencies have been overcharged.

Prather concedes, however, that he does not know what technologies are being used to provide for surveillance, what labor is actually being performed, and what costs are incurred.  Based upon these facts, the district court concluded that Prather's allegations were largely conjectural.  We agree that Prather has filed suit on the basis of speculation, and not—as required by the applicable law—true knowledge of fraudulent misconduct.  *See id.* at 525–26.

Nor are the telecom companies' charges a fraud that Prather viewed firsthand.  The FCA was designed "to encourage insiders to come forward with [information about possible fraud] where they would otherwise have little incentive to do so." *Biddle*, 161 F.3d at 538; *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir. 1991) (noting legislative history of the 1986 amendments to the FCA displayed Congress's "intent to encourage persons with first-hand knowledge of fraudulent misconduct" to come forward); *United States ex rel. Devlin v. State of Cal.*, 84 F.3d 358, 361 (9th Cir. 1996) (holding relator's knowledge was "secondhand" because it came from a defendant's employee "who had firsthand knowledge of the alleged fraud as a result of his employment").  As is evident from his speculative allegations, Prather did not have firsthand knowledge of the true costs of the transactions underlying his FCA suit.

Indeed, Prather's primary "firsthand" contribution is his inference that the information available amounts to evidence of FCA violations.  That assertion, however, does not provide

relief from the public disclosure bar, as "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1245 (9th Cir. 2000) (quoting *United States ex rel. Findley v. FPC-Boron Emps' Club*, 105 F.3d 675, 688 (D.C. Cir. 1997)) (internal quotation marks omitted); *see also United States v. Alcan Elec. and Engineering, Inc.*, 197 F.3d 1014, 1020–21 (9th Cir. 1999) (approving a district court's conclusion that relator did not have direct knowledge under the FCA "because his investigation merely added a legal name to describe the alleged circle of facts"). We therefore agree with the district court's conclusion that Prather did not have direct knowledge of fraud sufficient to qualify as an "original source." *See* 31 U.S.C. § 3730(e)(4)(B).

## B.  Voluntary Disclosure

In addition to having direct and independent knowledge of fraud, an "original source" under the pre-2010 FCA also must have "voluntarily provided the information to the Government before filing an action." *Id.* Prather argues that his disclosures to the FCC were voluntary, as they were not a part of his usual job duties. He also contends that he had to convince his office to include this theory of overcharges, and that he had tried to alert other governmental agencies of such overcharges in prior years.

The district court held that Prather's disclosures were not voluntary in light of his duties at the NYOAG and the facts underlying his participation in the 2004 FCC inquiry. The district court first considered the requirements of Prather's work for the State of New York, properly noting that it was

*not* Prather's job to question the reasonableness of charges by the telecom companies. *Prather*, 996 F. Supp. 2d at 869. The district court then determined:

> Even assuming that disclosing fraud was not a part of Relator's regular job description, his disclosure was involuntary because it was prompted by the FCC's request for comment and submitted in his capacity as Deputy Attorney General in Charge of the Statewide Organized Crime Task Force, in support [of] the official comments of his superior, the Attorney General. Although Relator asked Zwerling whether "there was a way to address" the issue of overcharging in the comments, he did not attempt to include any information himself and did so only after Zwerling asked him to provide an affidavit.

*Id.* (citations omitted). The district court also found that prior to 2004, Prather "apparently never even attempted to report his concerns to anyone in the federal government. . . . Instead, it was not until the FCC issued its requests for comment and Zwerling asked him to support the Attorney General's response that [Prather] conveyed his suspicions to the federal government." *Id.* at 870.

The district court's findings as to the affidavits submitted to the FCC are supported by Prather's deposition testimony. Prather testified that when the FCC sought comments from the NYOAG, Zwerling asked him to arrange for an affidavit from the OCTF. At that time, Prather "raised again the notion that [NYOAG was] being overcharged and wondered if there was a way to address that in the filing also." Prather

testified that Zwerling initially said "no . . . there was not a place in the comments for [the overcharging issue]." SER 86. Zwerling subsequently "changed her mind, and said [to Prather,] 'You know what?  I think . . . maybe we will put an affidavit in about that.  Can you do an affidavit for us?'"  *Id.* 86–87.  Given this testimony, the district court did not clearly err in concluding that Prather submitted his information to the FCC after being requested to do so by his office.

Furthermore, this Circuit has long recognized that a government attorney is not a quintessential *qui tam* relator. *See United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742–43 (9th Cir. 1995) (en banc) ("[T]he paradigm *qui tam* case is one in which an insider at a private company brings an action against his own employer."); *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992) ("*Qui tam* suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime."), *overruled on other grounds by Hartpence*, 792 F.3d at 1129.[2]  In *Fine*, an *en banc* panel of this Circuit considered whether a government auditor could be considered an original source of information he had provided to his government employer as part of his job responsibilities.  72 F.3d at 741.  The relator in *Fine* was a former employee of the Office of the Inspector General at the U.S. Department of Energy, whose job had been to supervise audits conducted by others.  *Id.* at 741–42. "He left the job in 1992, apparently disgruntled because his

---

[2] *See also* H.R.Rep. No. 99-660, at 23 (1986) ("The purpose of the qui tam provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward."); S.Rep. No. 99-345, at 14 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5279 (stating that the False Claims Act "reward[s] those private individuals who take significant personal risks to bring such wrongdoing to light").

supervisors either could not or would not take action against every perceived violation he brought to their attention. During the year following his retirement, Fine filed a total of seven *qui tam* actions under the False Claims Act." *Id.* at 742.

The *Fine* court considered the legislative history and purpose of the FCA, and contemplated whether a *qui tam* suit brought by a government employee "involve[d] application of a statute to a factual scenario Congress may never have envisioned." *Id.* at 743. Ultimately, the Court decided to rely solely on the statute's "unusually precise" requirement that information be offered "voluntarily." *Id.* (quoting *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1419 (9th Cir. 1991) and 31 U.S.C. § 3730(e)(4)(B)) (internal quotation marks omitted). In doing so, the Court questioned whether a salaried government auditor's disclosure of information learned on the job is truly "voluntary," citing the dictionary definition of the term: "Acting, or done, of one's own free will without valuable consideration; acting or done without any present legal obligation to do the thing done or any such obligation that can accrue from the existing state of affairs." *Id.* at 744 (quoting Webster's Third New International Dictionary 2564 (1981) (definition 1(g)) (internal quotation marks omitted). The Court concluded that, in contrast with this definition, Fine "acted in exchange for valuable consideration—his salary—and under an employment-related obligation to do the very acts he claims were voluntary." *Id.*

Unlike the relator in *Fine*, it was not Prather's job to discover and report fraud. *Cf. id.* at 743 (concluding that Fine "was a salaried government employee, compelled to disclose fraud by the very terms of his employment."). Nonetheless,

the relevant disclosures were made in response to his employer's request, which in turn was triggered by a federal inquiry. As the district court properly found, it was Zwerling, as the person charged with coordinating the NYOAG's response, who asked Prather to provide an affidavit on behalf of the Attorney General. For this task, which was accomplished during work hours, on a work computer, and in Prather's official capacity, Prather was compensated by a government salary.

Prather claims that although he ultimately submitted affidavits to the FCC, he had to fight to have the Attorney General accept his submissions. A similar scenario was addressed in *Biddle*, which reasoned that

> resistance by [Biddle's] superiors [does not] transform his unearthing of possible fraud into a voluntary investigation. The purposes underlying the FCA are to encourage individuals to report potential fraudulent activities being committed against the government, and to reward them for doing so. But where a government employee is paid to perform this function, the employee should not receive a windfall for merely doing his job. . . Uncovering fraud is a formidable task, especially when one's supervisors may be opposed, uninterested, or even involved in the fraud.

161 F.3d at 542. *Biddle* further reasoned that, by accepting a job that included fraud reporting, "Biddle assumed the risk of encountering such a difficult situation," and was therefore not entitled to any windfall via the FCA. *Id.*

This case is admittedly different from both *Fine* and *Biddle* in that no part of Prather's formal job description included a duty to report fraud against the government. Prather's job was to prosecute organized crime. The fact remains, however, that he was asked to submit affidavits on behalf of his employer. Although he had suspected fraud for many years and raised those suspicions within the NYOAG, he made no effort on his own to alert the FCC or any other federal agencies of his theories prior to 2004. It was only when Prather was assigned the task of assisting with his employer's response to the FCC's request for comments that he raised the matter, after asking if "there was a way to address" the issue of overcharging in the state agency's response. SER 86. We therefore conclude, like the district court, that Prather's submissions to the FCC were not "voluntarily provided" as required by the statute. *See* 31 U.S.C. § 3730(e)(4)(B).

## III.    State Law Claims

Without subject matter jurisdiction over Prather's federal claim, the district court properly concluded it had no discretion to exercise supplemental jurisdiction over Prather's state law claims. *See Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001).

## CONCLUSION

Prather brought a *qui tam* action based upon his theory of excessive overcharging by telecom companies. Because Prather was not an "original source" of that information as

defined by the FCA, we affirm the district court's dismissal of Prather's federal and state claims for lack of subject matter jurisdiction.

**AFFIRMED.**